**UNITED STATES of America,**

v.

**Aristoteles S. ONASSIS, alias Aristotle S. Onassis, Robert L. Berenson, Nicolas Cokkinis, Joseph E. Casey, Joseph H. Rosenbaum, Robert W. Dudley, Charles Augenthaler, George Cokkinis, Harold O. Becker, United States Petroleum Carriers, Inc., a corporation, Victory Carriers, Inc., a corporation, Central American Steamship Agency, Inc., a corporation, Sociedad Industrial Maritima Financiera Ariona Panama, S.A., a corporation, Sociedad Maritima Miraflores, a corporation, Transatlantica Financiera Industrial, Panama, S.A., a corporation, Defendants.**

No. 1647–53.

United States District Court
District of Columbia.

Sept. 9, 1954.

Leo A. Rover, Allen J. Krouse, J. Frank Cunningham, Howard F. Smith, Frederick W. Becker, Washington, D. C., for plaintiff.

William E. Leahy, Washington, D. C., Charles H. Tuttle, Edward J. Ross, Colby Stilson, Stuart H. Johnson, Jr., New York City, Edward B. Williams, Martin McNamara, Washington, D. C., Frank

L. Ball, Jr., Arlington, Va., Mathias F. Correa, New York City, Arthur J. Hilland, Vincent Burke, Jr., Washington, D. C., for defendants.

**YOUNGDAHL, District Judge.**

■ This is one of a series of cases arising out of the disposition of surplus vessels after the Second World War. At that time there were many surplus vessels which had been built to carry supplies and troops. As a result, Congress passed The Merchant Ship Sales Act of 1946, 50 U.S.C.A.Appendix, § 1735 et seq., which gave authority to the Maritime Commission to sell the vessels and set a price formula for the Commission to follow in selling them. The Act is merely directory to the Commission. It contains no penal provisions. Among other things, the Act provides that preference in the sale of the surplus vessels shall be given to citizens of the United States, 50 U.S.C.A.Appendix, § 1740, and adopts the definition of citizenship appearing in Section 2 of the Shipping Act of 1916, as amended.[1]

Suspicion arose that some alien purchasers were misrepresenting their citizenship in order to obtain vessels, and on terms as favorable as those given to citizen purchasers. An investigation was initiated. It has resulted in thirteen indictments against an aggregate of ninety-one defendants on the criminal side and libel proceedings against many of the vessels on the civil side.

These defendants have been indicted under 18 U.S.C. § 1001, and for violation of Section 1001. Section 1001 makes it a crime to knowingly and willfully falsify a representation of a material fact in any matter that is within the jurisdiction of an agency of the United States. In administering the Merchant Ship Sales Act of 1946 and the regulations and orders authorized and promulgated by the Act it was the duty of the Maritime Commission to determine:

1. Section 3(g) of the Merchant Ship Sales Act of 1946, 50 U.S.C.A.Appendix, § 1736 (g). Section 2 of the Shipping Act of 1916 as amended, 46 U.S.C.A. §§ 802, 803 reads:

"Sec. 2(a). That within the meaning of this Act no corporation, partnership, or association shall be deemed a citizen of the United States unless the controlling interest therein is owned by citizens of the United States, and, in the case of a corporation, unless its president and managing directors are citizens of the United States and the corporation itself is organized under the laws of the United States or of a State, Territory, District, or possession thereof, but in the case of a corporation, association, or partnership operating any vessel in the coastwise trade the amount of interest required to be owned by citizens of the United States shall be 75 per centum.

"(b) The controlling interest in a corporation shall not be deemed to be owned by citizens of the United States (a) if the title to a majority of the stock thereof is not vested in such citizens free from any trust or fiduciary obligation in favor of any person not a citizen of the United States; or (b) if the majority of the voting power in such corporation is not vested in citizens of the United States; or (c) if through any contract or understanding it is so arranged that the majority of the voting power may be exercised, directly or indirectly, in behalf of any person who is not a citizen of the United States; or, (d) if by any other means whatsoever control of the corporation is conferred upon or permitted to be exercised by any person who is not a citizen of the United States.

"(c) Seventy-five per centum of the interest in a corporation shall not be deemed to be owned by citizens of the United States (a) if the title to 75 per centum of its stock is not vested in such citizens free from any trust or fiduciary obligation in favor of any person not a citizen of the United States; or (b) if 75 per centum of the voting power in such corporation is not vested in citizens of the United States; or (c) if, through any contract or understanding, it is so arranged that more than 25 per centum of the voting power in such corporation may be exercised, directly or indirectly, in behalf of any person who is not a citizen of the United States; or (d) if by any other means whatsoever control of any interest in the corporation in excess of 25 per centum is conferred upon or permitted to be exercised by any person who is not a citizen of the United States.

"(d) The provisions of this Act shall apply to receivers and trustees of all persons to whom the Act applies, and to the successors or assignees of such persons."

(1) the qualification of applicants for the purchase of vessels; (2) the preference of United States citizen applicants over non-citizen applicants; (3) that the applicants possess the minimum financial requisites; (4) that the applicants have the ability to make the required payments; (5) the terms and conditions of the contract of sale; and (6) the continued financial responsibility of the purchasers to make deferred payments.

The Government charges that the defendants, willfully and knowingly, conspired to violate and violated Section 1001 by making and using false applications, balance sheets and financial statements in order to qualify for the purchase of vessels. The Government has alleged that the applications were false in that defendant Victory Carriers was represented as meeting the citizenship requirements of Section 2 of the Shipping Act of 1916, whereas in fact the corporation was under alien control. The Government has alleged that the balance sheets and financial statements were false in that the cash balance was reported to be greater than it really was.

Defendants have moved to dismiss and have moved for a bill of particulars. The grounds alleged in support of their claims are similar except that certain defendants assert, as an additional ground in their motion to dismiss, that they are entitled to immunity from prosecution under the Fifth Amendment and by virtue of Section 28 of the Shipping Act of 1916, 46 U.S.C.A. § 827, which is an immunity provision. These defendants are Nicolas Cokkinis, Joseph E. Casey, Joseph H. Rosenbaum, Robert W. Dudley, Harold O. Becker and Charles Augenthaler. The claims of immunity will be considered first. The claim of immunity by Charles Augenthaler, having a different basis than that of the others, will be considered separately.

Immunity

Section 28 provides:

"No person shall be excused, on the ground that it may tend to incriminate him or subject him to a penalty or forfeiture, from attending and testifying, or producing books, papers, documents, and other evidence, in obedience to the subpoena of the commission or of any court in any proceeding based upon or growing out of any alleged violation of this chapter; but no natural person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing as to which, in obedience to a subpoena and under oath, he may so testify or produce evidence, except that no person shall be exempt from prosecution and punishment for perjury committed in so testifying."

The defendants claim that they are entitled to immunity under Section 28 because they testified, under subpoena, before a grand jury in a proceeding "based upon or growing out of" alleged violations of the Shipping Act of 1916, and that their testimony was concerning the subject matter of the present indictment. The defendants testified before a grand jury impanelled in the District of Columbia on September 2, 1952. That grand jury returned the indictment in this case.

The sole purpose of immunity is to compel evidence that is otherwise not obtainable because of the Fifth Amendment privilege against self-incrimination. The history of immunity provisions has been recently considered in United States v. Monia, 1943, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 and in Smith v. United States, 1949, 337 U.S. 137, 69 S.Ct. 1000, 93 L.Ed. 1264.[2] Further discussion here is inappropriate. It is sufficient to note that this history has simply been the process of making the immunity provisions effective by

2. Also see Dixon, The Fifth Amendment and Federal Immunity Statutes, 22 Geo. Wash.L.Rev., 447–480, 555–581 (1954);

8 Wigmore, Evidence § 2281 (3d ed., 1940).

giving a witness the full protection to which he is legally entitled under the Fifth Amendment,[3] while at the same time providing safeguards against their misuse.[4] With this in mind we come to consideration of defendants' claims of immunity.

Two questions are presented: (A) Is Section 28 applicable to the Grand Jury proceeding before which the defendants testified? and (B) Are the defendants entitled to its protection?

A. Is Section 28 Applicable to the Proceeding Before Which the Defendants Testified?

The language in Section 28 makes it applicable in "any proceeding based upon or growing out of any alleged violation of this chapter". The Government claims that the proceeding was not based upon nor did it grow out of alleged Shipping Act violations, but rather was limited to inquiry of possible violations of 18 U.S.C. § 371 and 18 U.S.C. § 1001 which contain no immunity provision. In support of this the special assistant to the Attorney General who was in charge of the proceeding has submitted his letter of authority for that special grand jury. The letter only makes reference to possible violations of 18 U.S.C. § 371 and § 1001. And, of course, the indictment which that grand jury returned was brought under these sections only. The Government further argues that the subject matter of that inquiry was not related to Shipping Act violations, but only concerned possible false applications, balance sheets, and financial statements submitted to the Commission for the purchase of vessels, and that the procedure for the sale of the surplus vessels was covered *only* by the Merchant Ship Sales Act of 1946, which contains no immunity provision. Specifically, the Government claims that the defendants were examined only as to the applications, balance sheets and financial statements and were not questioned as to any matter based upon or arising out of Shipping Act violations.

The question is what comprises a "proceeding based upon or growing out of any alleged violations of this chapter".

The test clearly cannot be that the indictment must be brought under the Shipping Act or whatever act contains an immunity provision. The result of a special grand jury investigation often indicates violations of different or additional laws than those on which the proceeding was initially "based". The words "growing out of" must be given their common sense meaning. The undesirable consequence of the test the Government suggests is easily seen. Assume that a witness' compelled testimony indicated possible violations of Act A, which has an immunity provision, and Act B, which does not. The Government then prosecutes the witness under Act B arguing that the proceeding, as seen by the indictment, was one neither based upon nor growing out of alleged violations of Act A. If the Government's argument were successful, the immunity provision in Act A would be unconstitutional since its protection was not as broad as that which the witness was legally entitled to under the Fifth Amendment, Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195. Consequently the witness could refuse to testify in spite of the immunity provision, and accordingly, a witness could refuse to testify whenever his testimony would indicate a possible violation of an act containing no immunity provision. Such a result would indeed thwart the purpose of immunity provisions.

The requirements of the Fifth Amendment, as suggested above, and the phrasing of the immunity statutes "but no natural person shall be prosecuted or subjected to any penalty or forfeiture

3. E.g., Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; United States v. Monia, 1943, 317 U.S. 424, 63 S.Ct. 409.

4. E.g. Brown v. Walker, 1892, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819; Heike v. United States, 1913, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450.

for or on account of any transaction, matter, or thing * * * he may so testify or produce evidence" seems to require that a witness is made immune under any statute relevant to his testimony without regard to whether the statute contains an immunity provision. The cases also support the conclusion that the test for determining the nature of the proceeding for purposes of an immunity provision is the nature of its subject matter.[5]

In United States v. Goldman, D.C. Conn., 1928, 28 F.2d 424, two defendants were indicted for conspiracy to violate the National Prohibition Act, 27 U.S.C.A. § 1 et seq. after having testified before a grand jury investigating violations of that Act. The Act contained an immunity provision similar to Section 28. The court sustained a plea in bar noting that the language of the immunity provision, for or on account of any transaction, matter, or thing as to which in obedience to a subpoena and under oath, he may so testify or produce evidence,

"Without doubt, shields the witness from any criminal prosecution involving the same subject-matter, regardless of the specific statute upon which the indictment is predicated. * * * Poor indeed and derisively delusive, would be the protection afforded by section 30 of the National Prohibition Act, if its amnesty extended no further than to inhibit prosecutions formally based upon some section of the act." 28 F.2d at page 433.

The holding of the court seems clear that the nature of the proceeding is determined by its subject matter and not the statute under which the indictment is returned.

A similar situation was presented in United States v. Andolschek, 2 Cir., 1944,

142 F.2d 503. Andolschek appeared before a grand jury which subsequently indicted him for conspiracy to violate 26 U.S.C.A. Internal Revenue Code, § 4047(e). An immunity provision in 26 U.S.C.A.Int.Rev.Code, § 3119, extended immunity to a person testifying in any suit or proceeding based upon or growing out of an alleged violation of 26 U.S.C.A.Int.Rev.Code, § 3100–§ 3124, not including § 4047(e). The indictment was dismissed as to Andolschek. Judge Learned Hand noted:

"The indictment was, it is true, for a conspiracy to violate § 4047(e) of 26 U.S.C.A.Int.Rev.Code, and not any of those sections (§§ 3100–3124), for which § 3119 grants immunity. Nevertheless, the events laid in the indictment as the substance of the conspiracy, were a crime under § 3115(a), as well as under § 4047(e)". 142 F.2d at pages 505–506.

The same principle is illustrated in United States v. Weinberg, 2 Cir., 1933, 65 F.2d 394, certiorari denied 1933, 290 U.S. 675, 54 S.Ct. 93. There the grand jury sought to question the defendant concerning violations of the National Prohibition Act. The defendant refused to answer certain questions on the ground that the immunity provision of the National Prohibition Act would not protect him against subsequent prosecution for violation of the Internal Revenue laws. The witness was prosecuted for contempt. At the trial the judge again posed the questions and Weinberg again refused. Weinberg was judged in contempt and the judgment was affirmed. The Court of Appeals said that though the trial judge could not guarantee the witness absolute assurance of immunity from prosecution under the tax laws, he properly stated that Weinberg could not be prosecuted for any crime as to which he had given evidence.

5. United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503; United States v. Weinberg, 2 Cir., 1933, 65 F.2d 394 certiorari denied 290 U.S. 675, 54 S.Ct. 93, 78 L.Ed. 583; United States v. Goldman, D.C.Conn., 1928, 28 F.2d 424; Foot v. Buchanan, C.C.Miss., 1902, 113 F. 156 (by implication); Smith v. United States, 1949, 337 U.S. 137, 69 S.Ct. 1000, also supports the principle.

The question as to the necessary breadth of an immunity provision was precisely raised in the first case testing their constitutionality. Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195. The Court held that the immunity provision was not an adequate substitute for the protection guaranteed by the Constitution, saying that in order to be valid, an immunity provision "must afford absolute immunity against future prosecution for the offense to which the question relates", 142 U.S. at page 586, 12 S.Ct. at page 206. Consequently, subsequent immunity statutes have been drawn in broader terms usually containing the language (as in Section 28) that a person who testifies is protected from prosecution "for or on account of any transaction, matter, or thing as to which * * * he may so testify or produce evidence."

■■ As suggested by Mr. Justice Holmes in Heike v. United States, 1913, 227 U.S. 131, 142, 33 S.Ct. 226, 227, an immunity provision "should be construed, so far as its words fairly allow the construction, as coterminous with what otherwise would have been the privilege of the person concerned." Indeed immunity provisions should be, and as the cases indicate, have been construed to effectuate their purpose. Consequently the objective subject matter test must prevail.[6]

We now consider the subject matter of the proceeding before which the defendants testified. A knowledge of its background is helpful. As stated at the outset, this is one of a series of cases arising out of the disposition of surplus vessels after the Second World War. The cases arose out of what is editorially referred to as the "Shipping Investigation." The proceeding before which the defendants testified also arose out of that investigation.

In disposing of the surplus vessels, the Commission sold some of the vessels to corporations whose citizenship status was under suspicion. It was believed that although these corporations had an American president and American directors, and at least 51% of the stock was owned by persons who were citizens of the United States, up to 49% of the stock was owned by aliens. It was claimed that the aliens had made loans to the corporations, or had otherwise facilitated the requisite financing, and had in some instances paid a higher price for their shares than that paid by American citizens. There was some question as to whether such corporations met the citizenship requirements of Section 2 of the Shipping Act of 1916.

In 1950 the Maritime Administration, a successor agency to the Maritime Com-

6. There are additional problems which the use of the subject matter test avoids. If the nature of the proceeding would depend on a subjective test, such as some one's decision, whose decision would control? The grand jury's, the prosecutor's, or the instigator of the proceedings? Also, unless the subject matter test prevails, the following could occur: The witness claims the Fifth Amendment in the belief that the proceeding is not based on an act with an immunity provision. The Government indicts the witness under an Act with an immunity provision and cites the witness for contempt. On the other hand the witness could testify fully in the belief that the proceeding was based on an alleged violation of an act with an immunity provision and then be indicted under an act providing no immunity provision and face the possibility of his testimony being used against him. As previously discussed, this result would render the immunity provision unconstitutional and therefore ineffective. It should be noted also that this whole area of problems is avoided in the many immunity statutes which require the witness to claim immunity before testifying. Under such provisions, the witness would be protected if the claim was not accepted, for he could plead the Fifth Amendment as to self-incriminating testimony. And if the claim of immunity were accepted, the nature of the proceeding would be determined for purposes of the immunity provision. See, dissenting opinion of Mr. Justice Frankfurter in United States v. Monia, 1943, 317 U.S. 424, 431, 63 S.Ct. 409; Dixon, The Fifth Amendment and Federal Immunity Statutes, 22 Geo.Wash. L.Rev. 447, 465 and note 84 (1954).

mission,[7] appraised the policies as to the criteria used to determine whether a corporation qualified as a citizen under Section 2. An opinion was rendered by the general counsel for the Maritime Administration with particular reference as to whether certain corporations qualified as citizens under Section 2. United States Petroleum Carriers, Inc., and Victory Carriers, Inc., defendants in the present proceeding, were named. The question of how Section 2 should be interpreted was not resolved by the Maritime Administration.[8] Consideration of the Administration's interpretation of Section 2 is not, however, relevant here. It is sufficient to note for purposes here that the status of corporations named as defendants in the present case was then of concern.

The Administration subsequently conducted a field investigation to determine whether certain corporations were controlled by aliens. It appears from a summary of its report that the investigation related to whether certain corporations were citizens within the meaning of Section 2.[9] The report was transmitted to the Attorney General on January 15, 1951, for his consideration as to possible violations of the Shipping Act of 1916, 46 U.S.C.A. § 801 et seq.[10]

Subsequently, the Senate Permanent Sub-committee conducted an inquiry into the sale of the surplus vessels. It held 14 public meetings from February 18, 1952, to March 14, 1952, and issued its Interim Report on May 28, 1952.[11] This Report states that the inquiry, together with related matters, had been under investigation by the Maritime Administration since late in 1950, and that by June of 1951 the agency had prepared a series of investigative reports dealing with the activities of several companies.

Among those named was the United States Petroleum Carriers, Inc.

The Report further states that on June 15, 1951, the Secretary of Commerce sent copies of the reports to the Attorney General with a request that the reports be studied with a view toward determining whether or not certain of the transactions involved civil fraud on the United States, and whether or not certain criminal statutes of the United States had been violated. In this connection particular reference was made to the following provisions of the United States Code: 18 U.S.C. § 1001 and Sections 9, 37, 40 and 41 of the Shipping Act of 1916.[12]

The foregoing investigations have resulted in civil as well as criminal proceedings.

On the civil side, the Justice Department has seized and filed libels of information for forfeiture against a number of vessels owned by some of the corporations under investigation, including vessels owned by the United States Petroleum Carriers, Inc., and Victory Carriers, Inc.

In the main all the libels assert as their principal cause of forfeiture that the applicant corporations misrepresented their true citizenship status to the Maritime Commission when they represented that they were citizens within the meaning of Section 2 of the Shipping Act, whereas in fact they were controlled by aliens. The libels claim forfeiture under Section 9 of the Shipping Act, 46 U.S.C.A. § 808, because of the alleged misrepresentations made in the applications to the Maritime Commission, upon which the Commission acted favorably.

On the criminal side, the Attorney General has designated four special assistants who have returned a total of 13

---

7. The United States Maritime Commission was abolished by Reorganization Plan No. 21, 1950, 64 Stat. 1273, 46 U.S.C.A. § 1111, note, effective May 24, 1950. The Maritime Administration was created by Section 201 of Reorganization Plan 21. The functions of the Maritime Administration are described in Section 307 of the Plan.

8. See H.R.Doc. No. 472, 82d Cong. 2d Sess., 51–52 (1952).

9. Ibid, Appendix C, 95–101.

10. Ibid at 53.

11. Sen.Rep. No. 1613, 82d Cong. 2d Sess.

12. Ibid at 34–35.

indictments against an aggregate of 91 defendants.

From the foregoing it appears to the Court that in the most literal sense the grand jury proceeding was one based upon or growing out of alleged violations of the Shipping Act. Possible violations of the Shipping Act were mentioned at many stages of the investigation.

However, the more important test, in view of the purpose of immunity provisions, is one of determining if the *subject matter* of the inquiry did *in fact* relate to Shipping Act violations. In an affidavit the special assistant to the Attorney General who was in charge of the proceeding states that he was concerned only with possible violations of 18 U.S.C. § 1001. The investigation may have indicated violations of Section 1001 more clearly than any Shipping Act provisions. However, I am satisfied that the subject matter of the inquiry was also closely related to possible violations of Sections 9, 40 and 41 of the Shipping Act, 46 U.S.C.A. §§ 808, 838 and 839.

The possible violations of Sections 9 and 41 can be considered together. Section 9 makes it a crime to transfer vessels to persons who are not American citizens, or to put such vessels under foreign registry or flag, without approval of the Commission. And Section 41 provides that whenever approval of the Commission is required by Section 9, it is a crime to make a false statement of a material fact in order to secure such approval.

The Government has taken the position here that Section 9 relates only to *sales* of vessels by *private* parties and not to misrepresentations in applications to *purchase* vessels from the Commission. However, as indicated above, the Government has consistently maintained in the libel actions that misrepresentations in an application to purchase vessels violated the provisions of Section 9. In those proceedings the Government has argued that Section 9 applies to a sale by the Commission to a private party,

and that if misrepresentations were made in applications for the purchase of vessels, then the transaction must be deemed to have been made without the approval of the Commission and consequently the vessel is subject to forfeiture provisions of Section 9. This argument finds support in Meacham Corporation v. United States, 4 Cir., 1953, 207 F.2d 535, 537, 543, certiorari granted 1954, 347 U.S. 932, 74 S.Ct. 631. It is not necessary to consider the strength of the argument here. It is sufficient to realize that the subject matter of the inquiry related to *possible* violations of Sections 9 and 41.

Also, the subject matter of inquiry appears to be closely related to possible violations of Section 40, 46 U.S.C.A. § 838. Section 40 requires, among other things, that whenever certain documents are presented to the collector of customs to be recorded, the declarant shall file a statement setting forth facts relating to his citizenship status, and makes it a crime to make a false statement of a material fact in the statement. A bill of sale is one of the documents mentioned, and, as a matter of practice, the Commission gives a purchaser a bill of sale for each vessel at the time of the purchase, and the bill of sale is then taken to the collector of customs and the statement filled out. The statement, in the form prescribed by the Commission, requires the declarant to sign an affidavit that the purchaser of the vessels is a citizen of the United States. Certainly inquiry into alien control of purchasers and misrepresentations as to citizenship is quite as helpful for prosecution under Section 40 as it is for prosecution under 18 U.S.C. § 1001.

■ The Court is satisfied that the Government has acted in good faith and that the present indictment was not brought outside of the Shipping Act in order to sustain its argument that the immunity provision is not applicable. However, for the reasons stated, it is clear that the intentions of the prosecutor cannot be the test for the appli-

cability of an immunity provision. Under the subject matter test the Court is satisfied that the immunity provision was applicable to the proceeding before which the defendants testified.[13]

B. Are the Defendants Entitled to Immunity?

The question is whether the defendants, in the course of their testimony, made such disclosures as entitled them to immunity from the present prosecution.

■ Since the purpose of the immunity statutes is to make evidence available that otherwise could not be obtained, it is clear that the disclosures must be self-incriminatory. In effect the immunity is given in exchange for the self-incriminatory testimony. And since the scope for an immunity provision should be no broader than the protection afforded by the Fifth Amendment, the qualification has been added that the immunity extends only to prosecution for crimes substantially connected with the evidence given. Heike v. United States, 1913, 227 U.S. 131, 33 S.Ct. 226.

In the Heike case, Heike had been called before a grand jury investigating alleged violations of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, in the sugar refining industry. The testimony did not earn him immunity, under the relevant immunity provision, on a subsequent indictment for a fraud on the revenue. The indictment charged a violation of the Internal Revenue Laws by the secret introduction of springs in scales to cause them to indicate less than the actual weight. Heike had given a table of annual sugar meltings at the monopoly investigation. The indictment was sustained and the conviction upheld on the ground that there was no substantial connection between the fraud and the testimony submitted to the grand jury. Mr. Justice Holmes noted that, the evidence "did not tend to incriminate the witness. It neither led nor could have led to a discovery of his crime." 227 U.S. at page 143, 33 S.Ct. at page 228.

The rule laid down by the Heike case was stated in the following language:

"When the statute speaks of testimony concerning a matter it means concerning it in a substantial way, just as the constitutional protection is confined to real danger, and does not extend to remote possibilities out of the ordinary course of law." 227 U.S. at page 144, 33 S.Ct. at page 228.

The Heike rule has been applied in a series of cases. On one side there are the cases where the court has not found a "substantial relationship" between the testimony given and the crime for which the defendant is indicted.[14] For example, in the case of Himmelfarb v. United States, 9 Cir., 1949, 175 F.2d 924, certiorari denied 1949, 338 U.S. 860, 70 S.Ct. 103 a plea of immunity was denied on the ground that the testimony before the grand jury regarding alleged violations of price regulations had no relation to the subsequent prosecution for violation of income tax laws. On the other hand, there are a group of cases where the "substantial relationship" has

---

13. This rather extensive discussion was required because of the rule that unless the statute requires it, the witness need not assert the immunity privilege at the time of his testimony. United States v. Monia, 1943, 317 U.S. 424, 63 S.Ct. 409; Adams v. State of Maryland, 1954, 347 U.S. 179, 74 S.Ct. 442. The statutory requirement is preferable. For one thing, it makes it clear that immunity is given only for testimony that is self-incriminating and would not otherwise be volunteered. Also, it removes the necessity for determining the nature of the grand jury proceeding at this late date. When the privilege is asserted at the time of the testimony, the nature of the proceeding for purposes of the witness' immunity is determined by its acceptance or rejection. See 8 Wigmore, Evidence § 2282 (3d ed., 1940).

14. E.g. Himmelfarb v. United States, 9 Cir., 1949, 175 F.2d 924, certiorari denied, 1949, 338 U.S. 860, 70 S.Ct. 103, 94 L. Ed. 527; United States v. Greater New York Live Poultry Chamber of Commerce, D.C.N.Y.1929, 34 F.2d 967.

been found.[15]  Two of these cases are particularly helpful in considering the problem here.

In Edwards v. United States, 1941, 312 U.S. 473, 61 S.Ct. 669, 673, 85 L.Ed. 957, Edwards was indicted for conspiracy to violate and for violation of the Securities Act, 15 U.S.C.A. § 77a et seq., and mail fraud statutes in the sale of certain securities.  Only the Securities Act contained an immunity provision.  In a plea in bar Edwards claimed that he was entitled to immunity under the relevant provision since he had testified concerning his identity and relationship to the organization whose securities the indictment charged him with fraudulently selling.  The Supreme Court ruled that the plea was good on its face saying, "Petitioner's identity and his relationship to the trusts alleged to have been created by him as a part of the fraudulent scheme are of primary importance in the proof of his criminality."  The Heike case was distinguished since the testimony there " 'neither led nor could have led to a discovery of his crime,' " 312 U.S. at page 480, 61 S.Ct. at page 673.  The defendants claiming immunity assert that they made disclosures as to their "identity and relationship" in corporations involved in the conspiracy charged here.

In Smith v. United States, 1949, 337 U.S. 137, 69 S.Ct. 1000, the defendant gave testimony concerning matters falling within the jurisdiction of the Office of Price Administration, relying on an immunity provision in the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 901 et seq.  He was indicted for violations of the Second War Powers Act, 50 U.S.C.A.Appendix, § 633, and for conspiracy to violate the Emergency Price Control Act of 1942.  The charges involved misuse of priorities for materials and conspiracy to sell goods at above-ceiling prices.  An immunity plea was sustained.  The Court said, "Certainly many of these disclosures furnished leads that could have uncovered evidence of the unlawful conspiracy charged in the indictment.  Petitioner testified concerning transactions, matters and things substantially connected with parts of the conspiracy for which he was indicted—for example, the testimony that he bought material under invoice from a named supplier and paid for it by check on a named bank.  This evidence being substantially connected with the conspiracy, was ample to give immunity from the conspiracy prosecution."  137 U.S. at page 153, 69 S.Ct. at page 1008.  The defendants claiming immunity assert that they made disclosures which furnished leads that could have uncovered evidence of the conspiracy charged here.

It is clear, of course, that in order for immunity to obtain, the facts brought out must not be disassociated with the prosecution as in the Heike case.  Rather, they must be pertinent to the present prosecution and substantially connected with the alleged offense.  The rule is much easier to understand than to use fairly.

In affidavits in support of their motions, the defendants have sworn that they testified as to transactions, matters, and things which are pertinent to the present prosecution and which are substantially connected with the alleged offense.  The affidavits are based on factual allegations rather than hunches, surmises or beliefs.  These allegations, if true, would support the claim for immunity and for inspection of the grand jury minutes.

Regarding the motions for inspection of the grand jury minutes, the policy of the law, as set forth in Rule 6(e), Federal Rules of Criminal Procedure, 18

15. Smith v. United States, 1949, 337 U. S. 137, 69 S.Ct. 1000; Edwards v. United States, 1941, 312 U.S. 473, 61 S.Ct. 669; United States v. Greater Kansas City Retail Coal Merchants Ass'n, D.C. W.D.Mo.1949, 85 F.Supp. 503; Lumber Products Ass'n v. United States, 9 Cir., 1944, 144 F.2d 546, 553, reversed on other grounds, United Brotherhood of Carpenters and Joiners of America v. United States, 1947, 330 U.S. 395, 67 S. Ct. 775, 91 L.Ed. 973.

U.S.C., is clear. It dictates that grand jury proceedings shall be secret. Certainly most defense counsel requests for the production of grand jury minutes are denied. Easy granting of such requests would dangerously impair our system of grand jury procedure since it would open the way for an exploratory expedition into the Government's evidence, as well as encourage dilatory tactics. In light of this, the Court believed that the administration of justice would be best served if the grand jury minutes were submitted to the Court rather than to the defendants. The Government has consented to this and I have carefully examined the testimony which the defendants gave before the grand jury.

The grand jury minutes were read with three considerations in mind. First, that positive answers were given and not merely a denial of knowledge of facts. Second, that the disclosures were of facts asked for, not of facts volunteered or irrelevantly interjected. And, third, that the facts concern a matter as to which the answer might with reasonable possibility be incriminating on the offenses charged here. See 8 Wigmore, Evidence § 2282 at 505 (3d ed., 1940).

We now consider the testimony given by the defendants claiming immunity:

Robert W. Dudley was the incorporator of defendant United States Petroleum Carriers (USPC). He is a lawyer in the firm of Goodwin, Rosenbaum and Meacham and was employed in the firm at the time USPC was incorporated. Among other things, he testified as to his relationship and conversations with defendants Onassis, Barenson, Nicolas Cokkinis, Rosenbaum and Becker. He testified that he knew Onassis was interested in obtaining ships and that Onassis was the principal stockholder in defendant Sociedad Industrial Maritime Financiera Ariona Panama, referred to as Ariona. He testified as to the purpose of organizing USPC and the roles of defendants Casey and Barenson in organizing USPC. He testified that USPC was incorporated on September 27, 1947; that a total of 1,000 shares was authorized and that only 600 shares were originally issued—100 shares to Barenson, 250 shares to Admiral Bowen and 250 shares for himself; that the price of each share was $2, and that the total sum of $1,200 was paid for by Goodwin, Rosenbaum, and Meacham; that these shares were never paid for by the individuals; that the application to purchase vessels was approved on December 30, 1947; that on January 7, 1948, he purchased Admiral Bowen's shares for $7,500, Admiral Bowen then leaving the office of President of USPC; that on the same date he entered into an agreement with Barenson to sell him his 250 shares plus the 250 shares he purchased from Admiral Bowen for $250 a share, a total of $125,000; that shortly afterward an agreement was entered into with Ariona to sell the unissued 400 shares at $250 a share; that on March 3, 1948, Barenson sold 10 shares to a man by the name of Carver; and that on June 17, 1948, Barenson sold 10 shares to Nicolas Cokkinis and 90 shares to Ariona. As a result of these transactions Ariona, the company in which Onassis, an alien, is the principal stockholder, owned 49% of the stock in USPC for which it has paid a total of $122,500. The Government relies on this series of transactions, in part, to show that USPC was in alien control and did not meet the citizenship requirements of Section 2. Mr. Dudley testified that the reason Barenson would be willing to pay $250 a share was because there was an agreement whereby Mr. Onassis was to help in the financing of the vessels which had been allocated. He also testified that he put a restriction on the shares he sold to Barenson to the effect that they not be sold to aliens. And he testified as well as to the fee received by the law firm on each vessel and the profit he made in the sale of his shares.

Joseph E. Casey is a brother-in-law of Mr. Dudley. Mr. Casey had been successful in obtaining vessels for a company which he organized. Among other

things, Casey testified as to his role in organizing USPC, and as to how he helped in getting Admiral Bowen into the organization. He testified as to his relationship with Onassis, Barenson, Dudley and Admiral Bowen. He testified as to his relationship with the members of the Maritime Commission and as to his role in presenting the application of USPC to the Commission. He testified concerning the stock distribution of USPC and the stock transactions which the Government relies upon to show alien control. He also gave testimony concerning his knowledge as to how the ships could be financed. He testified as well as to the fee which he received from the proceeds of the stock purchases and as to the interest of Onassis in obtaining vessels.

Joseph H. Rosenbaum is a senior partner in the firm of Goodwin, Rosenbaum and Meacham. Among other things, he testified as to his relationship with Onassis, Barenson, Dudley, Casey and Admiral Bowen. He testified as to the frequency with which Onassis came into his law offices and as to discussions with Onassis, Barenson, Dudley and Casey. He gave testimony with respect to the payment by his firm of the USPC stock issued to Dudley, Barenson and Admiral Bowen, as well as the allocation of shares between them. He testified that he knew of the sale of 500 shares to Barenson at $250 a share and gave testimony regarding his participation in fixing the price of each share at $250. He testified as to the fee which his firm received for its services, the reasonableness of the fee under the circumstances, and as to the profit which he made from the sale of the 500 shares to Barenson.

Nicolas Cokkinis was the organizer of the defendant Central American Steamship Agency. Among other things, he testified as to his relationship and conversations with Onassis, Barenson, Dudley, Casey and Rosenbaum. He testified that he organized Central American Steamship Agency in order to service vessels owned by Onassis. He testified that he got into USPC when Barenson sold him 10 shares at $100 each; that he knew at that time that Onassis had an interest in USPC; that he knew that 90 shares had been sold by Barenson to Ariona on the same day for $250 a share; that he knew that the initial price for each share was $2; and that he subsequently became a member of the Board of Directors for USPC. He testified also as to the fund which Ariona furnished USPC in order for it to operate, and as to the dependence of USPC on Ariona. He testified as well that without assistance from Onassis, USPC would not have existed and he gave testimony as to the form in which this assistance was given.

Among other things, Harold O. Becker testified that he was treasurer and assistant secretary of USPC, Victory Carriers and of subsidiary corporations. He has been indicted under count one, the conspiracy count, and under counts six to eight which charge him with knowingly making and using a false balance sheet for Victory Carriers. He is charged with overstating the cash balance position of Victory Carriers as of December 31, 1950, by some $700,000. Under General Order 60, an applicant had to maintain a certain net worth and working capital in order to meet the minimum financial requisites as prescribed in the Order. It is the Government's theory that $750,000 was transferred to Victory Carriers on December 29, 1950, in order that it might show a good cash position in its year-end statement, but that the money was returned on January 2, 1951. Mr. Becker testified that he asked Simpson, Spence & Young (a shipping brokerage firm with whom all the related companies had accounts) for $750,000 on December 29 in order to show a good cash position at the end of the year. He testified that the figure was an arbitrary one. The Government's theory is that the money was transferred from Onassis owned companies to Central American Steamship Agency to Simpson, Spence & Young, which in turn forwarded the money to Victory Carriers on December 30, 1950,

and that the figure requested was not arbitrary. Becker testified that he sent a check for $750,000 to Simpson, Spence & Young on January 2, 1951. Becker also testified that the purpose of showing the money on the year-end statement of Victory Carriers was to meet the requirements of the Commission. He testified as to his knowledge of alien stock interests in USPC. He testified as to his relationship with Onassis, Barenson and Nicolas Cokkinis, and as to his knowledge of their shipping activities. He testified that Barenson and Cokkinis negotiated loans from the Metropolitan Life Insurance Company to finance the vessels. It was Mr. Becker's job to fill in and sign a required monthly affidavit to the effect that the corporation remained a citizen within the meaning of Section 2. Becker testified that beginning in September, 1952, he typed in the words, "in the opinion of the counsel for the corporation", since there was a question as to whether the corporation met the requirements and the attorney told him to put it that way.

■ From the foregoing, the Court is satisfied that the testimony was pertinent to the present prosecution, substantially related to the offenses charged here, and that it meets the three considerations with which it was read.

The Court is satisfied that much of the testimony recited above was self-incriminating on the issue of whether or not USPC satisfied the citizenship requirements of Section 2 and the conspiracy by the defendants to falsify that status. As suggested by Edwards v. United States, supra, 312 U.S. at page 479, 61 S.Ct. at page 673, such facts "are of primary importance in the proof of his criminality." The self-incriminating testimony included disclosures as to the way in which USPC was organized, the basis for stock distribution, how the stock was paid for, the number of shares remaining unissued, the various stock transactions by which Ariona gained 49% of the stock, the price which Ariona paid for these shares compared to the price paid by others for shares, the manner in which the vessels were financed, the manner in which Victory Carriers showed a good cash position in its year-end statement, and the profit received by various of the defendants in the sale of shares, as well as the fee received for services rendered. As suggested in Smith v. United States, supra, 337 U.S. at page 153, 69 S.Ct. at page 1008 "Certainly many of these disclosures furnished leads that could have uncovered evidence of the unlawful conspiracy charged in the indictment."

■■ Where the statute does not require a specific claim of immunity at the time of the testimony, the risk that an immunity provision will be successfully invoked at a later stage is one which must be fairly borne by the Government. The policy of immunity statutes to get evidence that is otherwise unavailable is simple to understand. Where the statute does not require the claim of privilege, the Government must decide whether the testimony is worth the possible immunity. Where the statute requires the specific claim of privilege the balance is whether the testimony is worth the immunity. Of course the immunity provisions should not be construed to provide broader immunity than is necessary to effect their purpose. Yet the courts have an obligation to make them effective by assuring that the protection afforded is equal to that which the witness is legally entitled to under the constitutional provision, without providing a gratuity to crime. Heike v. United States, 1913, 227 U.S. 131, 142, 33 S.Ct. 226. I am convinced that the dismissal of the indictment against defendants, Nicolas Cokkinis, Joseph E. Casey, Joseph H. Rosenbaum, Robert W. Dudley and Harold O. Becker is consistent with this obligation.

Turning now to defendant Charles Augenthaler; he has moved to dismiss the indictment on the grounds that he qualified for immunity under Section 28, and because the indictment has been obtained against him on the basis of il-

legal evidence which was secured in violation of his rights under the Fourth and Fifth Amendments.

Augenthaler is a general partner in the firm of Simpson, Spence & Young. The firm is engaged in business as steamship and chartering agents, and as brokers for the sale of ships. It is composed of seven general partners and four limited partners. On July 6, 1953, a subpoena duces tecum was served on the firm. It was addressed to Mr. Charles Waters, senior partner. Attached to the subpoena was an annex setting forth some fourteen documents or categories of documents that were to be produced. Mr. Augenthaler had already been named a defendant in two sealed indictments arising out of the "Shipping Investigation" at the time the subpoena was served. The subpoenaed documents were submitted to the grand jury and Mr. Waters testified. Mr. Paul F. Daly, comptroller of the firm, and Mr. Bartholomew J. Tuffy, an accountant of the firm (both of whom had also been subpoenaed) testified before the grand jury as well. The testimony of all three was closely related to the nature and import of the documents produced. Defendant Augenthaler contends that these documents were his partnership papers and consequently his "personal papers". He argues that by their compulsory production he was being forced to testify against himself, entitling him to immunity, or, in the alternative, that the compulsory production, without his knowledge, violated his Fourth and Fifth Amendment rights.

The contention is a serious one. Compulsory production of personal papers is sufficient to vitiate indictments returned on the basis of evidence so secured. If the documents are Augenthaler's "personal papers" he would have been able to quash the subpoena for their production. His rights to protect himself from having his personal papers used against him are not waived or diminished by the fact that the subpoena was served on another who had access to them. The wrong of such a result is apparent. One has cause to refuse the production of their personal papers whenever they think that the production might reasonably tend to incriminate them. The fact that Augenthaler was then under indictment in closely related issues certainly provided reasonable basis for such belief. If the documents were his personal papers and if Augenthaler had been subpoenaed to bring them, the Government may well have been obliged to inform him that he was then under indictment in order for him to intelligently consider the self-incriminating possibilities of their production. It is clear, though, that Augenthaler had no power to prohibit the testimony of Messrs. Waters, Daly and Tuffy on the ground that it would incriminate him, the privilege against self-incrimination being purely personal. The sole question is whether the subpoenaed documents were Augenthaler's personal records. If so, their compulsory production certainly offended his constitutional rights. As was said in Boyd v. United States, 1886, 116 U.S. 616, 633, 6 S.Ct. 524, 534, 29 L.Ed. 746, it is impossible "to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself." However, if the documents are not Augenthaler's personal papers, his rights have not been prejudiced by their production.

The subpoenaed documents were: the ledger account for USPC for January and February, 1948; two letters from Simpson, Spence & Young to the Chase National Bank requesting the transfer of certain moneys to the Riggs National Bank; all requests to Simpson, Spence & Young from Ariona to issue checks to USPC, charging Ariona's account; four checks to Victory Carriers and one check to Goodman, Rosenbaum and Meacham; two letters from Harold O. Becker requesting the firm to issue certain checks; two memoranda from Ariona requesting that certain sums be credited to its account; a journal entry showing the re-

ceipt of $700,000 from Ariona and the entry showing the payment of this amount to National City Bank; and, journals showing the monthly balances of Ariona, USPC and other companies in which Onassis was interested.

A statement of the policy of the law is helpful:

"The constitutional privilege against self-incrimination is essentially a personal one, applying only to natural individuals. It grows out of the high sentiment and regard of our jurisprudence for conducting criminal trials and investigatory proceedings upon a plane of dignity, humanity and impartiality. It is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him. Physical torture and other less violent but equally reprehensible modes of compelling the production of incriminating evidence are thereby avoided. The prosecutors are forced to search for independent evidence instead of relying upon proof extracted from individuals by force of law." United States v. White, 1944, 322 U.S. 694, 695, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542.

██ As a result of this policy the law is clear that the papers and effects protected from compulsory production must be the private property of the person making the claim, or at least in his possession in a purely personal capacity.[16] On the other hand it appears to be equally settled that since the privilege is purely personal it cannot be utilized by or on behalf of any organization such as a corporation.[17] The reasoning behind this rule is that individuals, while acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties and are not entitled to their purely personal privileges. Rather, they assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers and they are bound by its obligations. In their official capacity, therefore, they have no privilege against self-incrimination. The official records and documents of the organization are simply not the private records of the individual members or officers of the organization. Usually, if not always, they are open to inspection by the members and this right may be enforced on appropriate occasions by available legal procedure. They, therefore, embody no element of personal privacy and carry with them no claim of personal privilege.[18]

Augenthaler argues, however, that a partnership must be distinguished from a corporation. He points to the fact that unlike the officer of a corporation, the partners in a partnership are really co-owners of all the partnership property. Augenthaler argues that while partnership ownership is shared, it is none the less personal; and consequently the records of the partnership are really the personal records of each of the partners. Defendant cites several cases as support for this position.[19] A discussion of some of them will be helpful.

. Boyd v. United States, 1886, 116 U.S. 616, 6 S.Ct. 524, was a suit for forfeiture against thirty-five cases of plate glass under a revenue statute of 1874 which

---

16. Boyd v. United States, 1886, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; United States v. White, 1944, 322 U.S. 694, 695, 699, 64 S.Ct. 1248.

17. United States v. White, note 16 supra, 322 U.S. at page 699, 64 S.Ct. 1248; Essgee Co. v. United States, 1923, 262 U.S. 151, 43 S.Ct. 514, 67 L.Ed. 917; Hale v. Henkel, 1906, 201 U.S. 43, 26 S. Ct. 370, 50 L.Ed. 652.

18. See United States v. White, note 16 supra, 322 U.S. at pages 699–700, 64 S.Ct. 1248.

19. Boyd v. United States, 1886, 116 U.S. 616, 6 S.Ct. 524; United States v. Lawn, D.C.S.D.N.Y.1953, 115 F.Supp. 674; In re Subpoena Duces Tecum, D.C.N.D. Cal.1948, 81 F.Supp. 418; United States v. Brasley, D.C.W.D.Pa., 1920, 268 F. 59.

made it a criminal offense to defraud the revenue and which also subjected the merchandise to forfeiture. The statute required the defendant, on motion by the Government attorney, to produce his private books, invoices and papers in court, or else the allegations of the Government were to be taken as confessed. By authority of Section 5 of the statute, an order was issued to E. A. Boyd & Sons, a partnership, compelling the production of an invoice. Section 5 read in pertinent part: "In all suits and proceedings other than criminal arising under any of the revenue-laws of the United States, the attorney representing the Government, whenever, in his belief, any business-book, invoice, or paper, belonging to or under the control of the defendant or claimant, will tend to prove any allegation made by the United States, may make a written motion, * * *." 18 Stat. 187. The Court held that the statute was unconstitutional, as repugnant to the Fourth and Fifth Amendments, saying, "a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is compelling him to be a witness against himself, within the meaning of the fifth amendment to the constitution, and is the equivalent of a search and seizure * * * within the meaning of the fourth amendment", 116 U.S. at pages 634–635, 6 S.Ct. at pages 534–535. The case is properly cited as basic authority for the rule that the privilege protects compulsory production of a person's private property. However, the question of whether the invoice was a private business record was not raised. It was treated as such, without question, by the Government and the defendant throughout the trial and appellate proceedings. The question was not raised because it was certain that the invoice came within the broad language of the statute, "business-book, invoice, or paper, belonging to or under the control of the defendant or claimant". The case concerned the constitutionality of the statute. It is true, however, that the Court clearly described the invoice as the private paper of the defendant. But the case should not be considered as holding, as Augenthaler suggests, that all partnership records constitute a "man's private papers" and are always immune from compulsory production.

In United States v. Brasley, D.C.W.D. Pa.1920, 268 F. 59, a subpoena was served on the Brasley-Krieger Shoe Co., and to its three partners, to produce certain sales slips, papers and records. The partnership operated four retail shoe stores. The district court said that the subpoenaed papers were the private documents of the three partners. It found that the production of the books and papers was compulsory and in violation of their rights under the Fourth and Fifth Amendments. However, this holding was based in large measure on the severe manner in which the documents were obtained. It was noted that the evidence justified a finding that there was a seizure of the books and papers by the officer. When the subpoena was served two agents watched to be sure that the documents were immediately put into bundles, and that no material document was omitted. They were watchful that none of the records got away while they were in the store. The hands of the officers kept a grasp on the records while they were being taken from the store to the Federal Building. The importance which the court attached to this procedure is seen in the language of its opinion, " * * * the entire proceedings whereby the books of the petitioners were seized and produced in evidence before the grand jury were illegal, as being in contravention of their rights fixed by the Fourth and Fifth Amendments", 268 F. at page 65. The nature of the documents does not appear to have been crucial to the court's consideration. Although the court did find that the documents were the personal papers of the partners, the case hardly compels a principle that all partnership records are always personal.

It should be remembered that the purpose of the privilege is to aid in achieving dignity, humanity and

impartiality in criminal administration. It is to prevent the use of legal process to force a defendant to aid the state in obtaining his conviction. It is not intended to give the defendant or other individual an advantage. The reason for the corporate rule is clear since by the nature of the organization, as well as the association of its officers and agents, they do not act except as representatives of the group. Likewise the reason for the rule that the privilege which exists as to private papers cannot be maintained in relation to "records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established", Davis v. United States, 1940, 328 U.S. 582, 589–590, 66 S.Ct. 1256, 1260, 90 L.Ed. 1453, is easily understood since the records are not private but rather have important public aspects. However, it is also clear that "there are limits which the government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself." Shapiro v. United States, 1947, 335 U.S. 1, 32, 68 S.Ct. 1375, 1391, 92 L.Ed. 1787. As these rules indicate, the privilege must be and has been considered in the light of the circumstance to which it is applied.

This approach to the privilege is well posed in United States v. White, 1944, 322 U.S. 694, 695, 64 S.Ct. 1248. The Court held that labor unions, although they are not incorporated, as well as their officers and agents acting in their official capacity, cannot invoke the privilege. Justice Murphy said: "This conclusion is not reached by any mechanical comparison of unions with corporations or with other entities nor by any determination of whether unions technically may be regarded as legal personalities for any or all purposes. The test, rather, is whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only." 322 U.S. at page 701, 64 S.Ct. at page 1252.

The test set in the United States v. White, supra, has since been applied in In re Subpoena Duces Tecum, D.C.N.D. Cal.1948, 81 F.Supp. 418, which defendant cites. The case involved a subpoena directing Elmer Casperson, a partner of O. Casperson & Sons to bring certain records and communications passing between him and his employees and agents. The partnership was composed of five copartners, including Lester, Harold and Elmer Casperson. The court ruled that their rights under the Fourth Amendment had been violated and granted a motion to quash the subpoena. It is significant though that the court did not rely on the notion that all partnership records are personal and consequently protected by the privilege. The court was careful to find that it was a "small family partnership" and therefore not " 'so impersonal in the scope of its membership and activities that it cannot * * * represent the purely private or personal interests of its constituents,' " 81 F.Supp. at page 421. It was specifically noted that although the doctrine of the White case could not be extended to O. Casperson & Sons, "It may be that some partnerships, which have a large number of partners, perhaps special or limited as well as general, might, as well, take on the habilaments of an association or corporation." 81 F.Supp. at page 421.

The property notion that partners are co-owners of the partnership property serves many purposes. Yet there is no reason to impose it on an analysis which it is not intended to serve. As suggested by the White case, mechanical comparisons between incorporated and unincorporated organizations are not helpful. There is no virtue in distinction without difference.

Where a partnership has a character "so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only", United States v. White, supra, 322 U.S. at page 701, 64 S.Ct. at page 1252, it should be treated accordingly. There is, of course, a substantial difference between a large and impersonal partnership and a family partnership. The closeness and nature of control in a family partnership as well as the real and healthy identification of the partner with the partnership makes it easily understood why its records should be treated as personal. The purpose and spirit of the privilege requires that it only be available to partners in such family or similarly personal partnerships.

It is worthwhile to look at the nature of Simpson, Spence & Young and the nature of the documents subpoenaed. As stated at the outset, the firm acts as brokers for the sale, purchase and chartering of ships. It has offices in London and Glasgow as well as in New York. It acts as manager for the Texas Transport & Terminal Company, Inc., which has offices in New York, Philadelphia, Baltimore, Charleston, Savannah, New Orleans, Galveston, Corpus Christi, Houston, Dallas and Memphis. It is sufficiently organized to have Mr. Daly as comptroller and Mr. Tuffy as an accountant and a substantial number of employees working in the accounting and operations departments. Such an organization can hardly be considered small or personal.

As to the documents subpoenaed, the name of Mr. Augenthaler does not appear on any of the documents. The requests to issue checks against the account of Ariona were directed to the attention of Mr. Tuffy. The letters from Mr. Becker were directed to the firm.

The checks sent by the firm were signed in the firm name. The ledger accounts and journal entries appear to be completely impersonal. From the above, it appears that all of the subpoenaed documents were official books and records of the partnership and, consequently, were not protected from compulsory production.[20]

It may be conceded that there are additional arguments as to why the privilege may not be invoked by the officers and agents of labor unions which are not present here. But we do not need the precise fact situation of United States v. White, supra, in order to reach the same result. It is sufficient that the essential character of the White case and the privilege is in agreement with the result reached here. The result is consistent with our high regard for conducting criminal trials and investigatory proceedings upon a plane of dignity, humanity, impartiality and equality. The result is consistent, as well, with full respect for the sovereign rights of the individual and the legitimate interests of the state.[21] The state is not entitled to use Mr. Augenthaler or his possessions when proceeding against him. The right of Mr. Augenthaler not to cooperate with the state in such manner as will assist in his prosecution is paramount. Yet the right of the state to prosecute for crime should not be hindered by theoretical infringements on individual's rights. The infringement must be real, and it is not real unless the documents are personal. There has been no real infringement here.

For the foregoing reasons the Court is convinced that Mr. Augenthaler's rights have not been violated under the Fourth or Fifth Amendments and consequently that he is not entitled to immunity.

Constitutionality of Section 2

Defendants also contend that the citizenship requirements of Section 2 of the

20. See Meltzer, Required Records, the McCarran Act, and the Privilege Against Self-incrimination, 18 U. of Chi.L.Rev. 687 (1951).

21. See Fortas, The Fifth Amendment, 25 Cleveland Bar Association Journal 91 (1954).

Shipping Act are unconstitutional, as being void for vagueness. They argue that since they have been charged with knowingly falsifying their citizenship status under Section 2, the provisions of that section must meet the criminal statute requirements of certainty. Specifically they point to Section 2(d). This paragraph recites that the controlling interest in a corporation will not be considered as held by American citizens "if by any other means whatsoever control of the corporation is conferred upon or permitted to be exercised by any person who is not a citizen of the United States." Defendants contend that Section 2(d) is vague since "control" can mean an infinite number of things.

█ It is certain that a criminal provision must be certain enough so that men of ordinary intelligence need not guess as to its meaning or differ as to its application. The provision must be sufficiently clear so that one can intelligently choose what course it is lawful for him to pursue. Williams v. United States, 1951, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774; Screws v. United States, 1945, 325 U.S. 91, 103–104, 65 S.Ct. 1031, 89 L.Ed. 1495.

The only judicial opinion on the question of vagueness of Section 2 is Meacham Corporation v. United States, 4 Cir., 1953, 207 F.2d 535, 548. The court said:

"The appellants also contend that § 2 of the Shipping Act is unconstitutional because it constitutes a deprivation of property without due process of law in violation of the Fifth Amendment, in that the conditions set out in § 2 with respect to corporate citizenship are too vague * * *. A more explicit and painstaking attempt to define what is meant by citizenship than is contained in the statute can hardly be imagined." 207 F.2d at pages 547–548.

█ The word "control" must be considered within the context of the other paragraphs in Section 2. When so viewed it acquires a common sense meaning within the intention of the Section. The intention of the Section is simply to set down the essential citizenship requirements in order that an American Merchant Marine may be assured. Of course there may be some difficulty in determining whether certain marginal violations come within the meaning of the Section. However, this does not automatically render the provision unconstitutional for vagueness. Jordan v. De George, 1951, 341 U.S. 223, 229–232, 71 S.Ct. 703, 95 L.Ed. 886. Perfect standards of specificity are neither required nor possible.

█ Moreover, Section 2 is not a penal provision; it is merely descriptive of the citizenship requirements. Defendants have not been indicted for violating Section 2, but rather for "knowingly and willfully" falsifying their compliance with Section 2. The question is whether vagueness considerations of Section 2 are relevant since under 18 U.S.C. § 1001 the Government must prove that defendants' affidavits were made in conscious and intentional violation of Section 2.

This precise question was considered and decided in American Communications Ass'n, C. I. O. v. Douds, 1950, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925. The question was the constitutionality of 9(h) of the National Labor Relations Act, as amended by the Labor Management Relations Act of 1947, 29 U.S.C.A. § 159(h), commonly referred to as the non-Communist affidavit provision. Prosecution was under 18 U.S.C. § 1001 for "knowingly and willfully" falsifying the affidavit. A defendant argument was that 9(h) was unconstitutionally vague in the use of the terms "affiliated", "supports", and "illegal and unconstitutional methods". Mr. Chief Justice Vinson said:

"* * * There is little doubt that imagination can conjure hypothetical cases in which the meaning of these terms will be in nice question. The applicable standard, however, is not one of wholly consistent academic definition of abstract

terms. It is, rather, the practical criterion of fair notice to those to whom the statute is directed. The particular context is all important.

"The only criminal punishment specified is the application of § 35 (A) of the Criminal Code, 18 U.S.C. § 1001, 18 U.S.C.A. § 1001, which covers only those false statements made 'knowingly and willfully.' The question in any criminal prosecution involving a non-Communist affidavit must therefore be whether the affiant acted in good faith or knowingly lied concerning his affiliations, beliefs, support of organizations, etc. And since the constitutional vice in a vague or indefinite statute is the injustice to the accused in placing him on trial for an offense, the nature of which he is given no fair warning, the fact that punishment is restricted to acts done with knowledge that they contravene the statute makes this objection untenable. As this Court pointed out in United States v. Ragen, 1942, 314 U.S. 513, 524, 62 S.Ct. 374, 379, 86 L.Ed. 383, 'A mind intent upon willful evasion is inconsistent with surprised innocence.' (cases cited.) Without considering, therefore, whether in other circumstances the words used in § 9(h) would render a statute unconstitutionally vague and indefinite, we think that the fact that under § 35(A) of the Criminal Code no honest, untainted interpretation of those words is punishable removes the possibility of constitutional infirmity." 339 U.S. at pages 412–413, 70 S.Ct. at page 691.

This statement is quite dispositive of the defendant's argument as regards consideration of the constitutionality of Section 2 for purposes of the indictment under 18 U.S.C. § 1001.

Statute of Limitations

As an additional ground for dismissal, defendants urge that counts 2 to 7 be dismissed on the ground that the indictment was not "found" within three years after the alleged offenses were committed. Defendants' reasoning is that (1) the offenses in these counts were alleged to have been committed on January 3, January 12 and January 16, 1951; (2) the indictment was filed in open court and sealed on October 13, 1953, less than three years after the commission of the alleged offenses; (3) the seal was not broken until February 8, 1954, more than three years after the commission of the alleged offenses; (4) therefore, the indictment was not found until February 8, 1954.

The applicable statute is 18 U.S.C. § 3282. It reads:

"Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within three years next after such offense shall have been committed."

The question is whether an indictment has been "found" when it is filed in open court even though it remains sealed.

The case of United States v. Michael, 3 Cir., 1949, 180 F.2d 55, 56, certiorari denied 1950, 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1383, is precisely in point. There the appellant argued that since the sealed indictment was not opened within three years after the alleged offense was committed it was not "found" within the three year statute of limitations. To this point the court said:

"We do not agree. The finding of an indictment is the function of the grand jury. * * * When the grand jury has found an indictment to be a true bill and has completed its action thereon by returning the indictment, duly endorsed as a true bill by its foreman, to the district court in open session, its function has been fulfilled. The indictment has been 'found' within the meaning of the statute of limitations regardless of what the district court may thereafter do or fail to do with respect thereto."

Defendants argue that the result of the United States v. Michael, supra, works an injustice. They argue that under the ruling in the case the Government could keep an indictment under seal for many years and then commence its prosecution when the witnesses and proofs necessary for the defense have become unavailable. Certainly the purpose of the statute of limitations is to avoid such experience. However, the Michael case should not be interpreted so broadly. The court specifically found that the appellant was not prejudiced by the delay of fifty-four days in making the indictment public.

Criminal Procedure Rule 6(e) authorizes indictments to be kept secret until the defendant is in custody or has given bail. The rule is important to criminal administration. It certainly encompasses a situation where the defendant cannot be found within three years after the alleged commission of the offense. If the situation was not covered, the result would only encourage fugitives from justice. Of course an extensive delay could prejudice the defense and thereby invade the purpose of the statute of limitations. The defendants who are available in an indictment naming several defendants should not have their rights endangered by the absent defendant. This is simply another circumstance in which the rights of the individual must be weighed against those of the state. The rights of the individual have not been infringed, however, unless he can show prejudice as a result of the delay. The defendants have not claimed that they have been prejudiced by the delay and on the basis of the record the Court is satisfied that they were not prejudiced as a result of the indictment remaining sealed.

Bill of Particulars

Defendants have moved for a bill of particulars under Rule 7, Federal Rules of Criminal Procedure.

The particulars requested can be broken down into six main categories: (1) documents; (2) statements in documents; (3) in what way are the statements false; (4) financial details; (5) data as to material facts allegedly concealed; (6) names and dates.

It is clear that the extent to which a bill of particulars should be granted is largely one of discretion. In exercising its discretion, the Court has recognized that the purpose of the Rule is to serve as an aid in the search after truth, and to remove elements of surprise and chance from trials. On the other hand, the Government has a legitimate interest in not being compelled to disclose every feature of its case. Accordingly, the extent to which the bill should be granted turns on the peculiarities of each case.

As is apparent, this is a complex case. The range of the indictment extends over six years. Numerous transactions, names, dates, conversations and statements are involved. The Government must rely on the rightness or wrongness of representations, figures, and other involved subject matter. Cooperation between both parties will be necessary if a long and drawn out trial is to be avoided.

Defendants are certainly entitled to documents which the Government will rely upon in its proof. For one thing, there is no fear of fabrication of rebutting evidence to the documents. For another, defendants would probably be entitled to the production of the documents through other discovery procedure. Rules 16 and 17, Federal Rules of Criminal Procedure.

Considering the purpose of the rule, and considering the legitimate interests of each side in making proper preparation for trial, the Court will order: that the Government produce to the defendants copies of all documents which it will rely upon for proof which are not matters of public record or of which the defendants do not already have copies; that the Government furnish particulars to the defendants of (a) the statements in the documents it will rely upon as false, (b) what financial details in the

documents it will rely upon as false, (c) what facts omitted from the documents it will rely upon as concealed, and (d) the names of all persons and the dates of all transactions it will rely upon as involved in the conspiracy.

The Court has seriously considered the remaining grounds forwarded by defendants in their motions to dismiss, but feels that they do not necessitate discussion.

For the reasons herein expressed, the indictment will be ordered dismissed against defendants Robert W. Dudley, Nicolas Cokkinis, Joseph E. Casey, Joseph H. Rosenbaum and Harold O. Becker. The motion for a bill of particulars will be granted as expressed above. Defendants' motions will be denied in all other respects. An appropriate order will be entered.