## UNITED STATES v. BRASLEY et al.

(District Court, W. D. Pennsylvania. May Term, 1920.)

No. 148.

**Witnesses ⬤══298—Defendant cannot be required to produce his private papers to furnish evidence to grand jury.**

Under Const. Amends. 4, 5, declaring that no person shall be compelled in any criminal case to give evidence against himself, defendants, who composed a partnership, could not be required to produce their records before the grand jury for the purpose of furnishing evidence in a criminal prosecution against them, and such records having been brought in on subpœna duces tecum served on one of such defendants alone, special agents of the Department of Justice who served the subpœnas, superintending the bringing of the records into court, they must, on petition of defendants, be returned, and any memoranda taken therefrom, and any copies or photographs made thereof should also be returned.

Simon Brasley and others, indicted for alleged violations of Act Aug. 10, 1917 (Comp. St. §§ 3115⅛e–3115⅛r) as amended by Act Oct. 22, 1919 (41 Stat. 297), and Criminal Code, § 37 (Comp. St. § 10201), petition for an order upon the United States attorney, requiring the return of sales slips, papers, and records alleged to have been unlawfully taken from defendants. Rule made absolute, and records ordered returned.

A. P. Burgwin, Asst. U. S. Atty., of Pittsburgh, Pa.
Ben Paul Brasley, of Pittsburgh, Pa., for defendants.

ORR, District Judge. A petition has been filed by Simon Brasley, Leon Krieger, and Bessie B. Cohen for an order upon the United States attorney, requiring him to return certain sales slips, papers, and records which the petitioners aver belong to them, and which they charge were unlawfully taken from them, and used against them, in violation of their rights as guaranteed by the Fourth and Fifth Amendments to the Constitution of the United States. The facts material to the issue raised by the said petition and an answer thereto, filed by a former United States attorney, are as follows:

Said United States attorney, on the 3d day of May, 1920, presented to this court his petition for subpœnas duces tecum, entitled:

"In the Matter of the Grand Jury Investigation of Alleged Violations of the Act of August 10, 1917, as Amended by the Act of October 22, 1919, and Section 37 of the Criminal Code of the United States, on the Part of the Brasley-Krieger Shoe Company, Simon Brasley, Leon Krieger, and Bessie B. Cohen, Owners and Officers Thereof."

Said petition contained the averments that his attention had been called by various persons, including officers and agents of the government of the United States, to alleged violations of the said acts of Congress by the persons named as aforesaid, that he believed that the said persons were guilty, that the grand jury was now sitting in this district, and that he believed it to be his duty to bring such matters before the grand jury for investigation, and that in the conduct of such

investigation certain documentary evidence should be produced. There is an averment in the petition that the Brasley-Krieger Shoe Company conducted a chain of retail stores as follows: Fifth Avenue, Pittsburgh; Frankstown Avenue, Pittsburgh; Homestead, and Braddock— all within this district. The petition contained the prayer for leave to issue subpœnas duces tecum directed to the Brasley-Krieger Shoe Company, its officers, agents, and employés hereinafter named, requiring them to produce the documentary evidence as follows, to wit:

"To the Brasley-Krieger Shoe Company, Simon Brasley, Leon Krieger, and Bessie B. Cohen, Pittsburgh, Pa., to appear before the grand jury and with you bring: All books showing all sales of shoes made by the Brasley-Krieger Shoe Company since October 22, 1919, together with the price received in consideration thereof; also all contracts for hire of clerks and employés that have been in the employ of the company since October 22, 1919; also all books showing the wage or salary accounts of such clerks, together with all pay rolls and all canceled checks in payment of wages and salaries; and also all books or records of account showing commissions paid to clerks in addition to or in connection with their regular pay, wages or salary; also all books and records of accounting for the portion of the sale price of shoes over and above the regular fixed and marked price of such shoes; also all sales tickets showing sales made since October 22, 1919."

On the same day the court ordered and directed that subpœnas duces tecum issue as prayed for, and on the same day the subpœnas were issued. There was no time stated in the subpœnas at which the witnesses should appear, but they were required to appear "forthwith." The United States attorney did not cause the subpœnas to be served as soon as they were issued, but directed them to be served on the 5th day of May, 1920. In addition to the subpœnas duces tecum, other subpœnas were issued, summoning clerks of the Brasley-Krieger Shoe Company to appear and testify before the grand jury. All of these subpœnas were served on the morning of the 5th of May, 1920, by special agents or officers of the Department of Justice. It appears that four of said officers or special agents, named Van Vleck, Rice, Morgan, and Murdock, went to the Fifth avenue store. Mr. Rice and Mr. Van Vleck went into the store first, leaving Mr. Morgan and Mr. Murdock outside. Mr. Morgan had the subpœnas for the clerks. It was arranged that he should remain outside until Mr. Rice had served the subpœnas duces tecum. Mr. Rice served the subpœnas duces tecum upon Mrs. Bessie B. Cohen, by giving her a copy of the subpœna, which she read. Thereupon Mr. Van Vleck left the store and notified Mr. Morgan that service had been made upon Mrs. Cohen, whereupon Mr. Morgan entered the store and served subpœnas upon certain of the employés. Mr. Morgan and Mr. Rice remained in the store until the books and papers were done up in packages and ready to be taken before the grand jury, and they accompanied the clerks and the books to the Federal Building, where the grand jury was in session; the said two agents carrying the packages containing the books from the store to the Federal Building. Mrs. Cohen asked Mr. Rice if it would not be possible for him to wait a while and permit part of her clerks to go to luncheon. According to his testimony, he said:

"I would be very glad to do it, and as I remember I waited in her store 40 minutes, in order to enable part of her clerks to go to lunch."

The records desired were kept in the office, which was located on a balcony in the store. Mrs. Cohen proceeded up to the office to get the records, and, as Mr. Rice testified, after she had been there about two minutes, Mr. Morgan said: "We had better go up." Mr. Morgan went up to the office, and so did Mr. Rice. Mr. Rice, in direct examination was asked the question: "Q. Did you not taken possession of any of the books or papers?" To which he answered: "Not while I was in the store." He was asked the further question:

"Q. Did Mr. Morgan take possession of any books or papers? A. Mr. Morgan did not take possession of any papers, but he assisted Mrs. Cohen in wrapping up some papers in my presence. Q. While she was engaged in wrapping, Mr. Morgan went to her assistance? A. They both started to put the records together. The paper didn't seem to be large enough."

Looking at Mr. Rice's testimony further, we find the following:

"Q. Those composed all the records of the cashier's desk? A. Not all of them, because we left some records she said she wanted to use that day. Q. What did she say about those records? A. She said they were records in regard to the sales of the day, or other day. Q. What did you say to that? A. I consented to that; I said we would be glad to leave those records, and call for them later, if required."

The same witness testified that he carried one of the packages out of courtesy to one of the women clerks, who had it in her hand as she was about to leave the store. On cross-examination, he testified as follows:

"Q. Mr. Morgan was with you at the time? A. Mr. Morgan was within a few feet. Q. He had also been introduced as a representative of the Department of Justice? A. Yes, sir. Q. Why did you intrust valuable papers, as you thought, to two lady clerks that were leaving the store? A. What did I do? Q. To two lady clerks. A. There was nothing unusual about that; I couldn't get away from the papers; no reason why I shouldn't have that much confidence in those two ladies. Q. Did you have them under your control? A. Yes, sir; practically."

Again the same witness testified:

"Q. You knew the importance of the papers? A. Yes. Q. Still you were not interested enough to see where they were carried to? A. I knew they were not going to get away. Q. If you didn't see, they might have disappeared without your knowing anything about them? A. No; Morgan and I stood there, and we knew generally what was going on."

On redirect examination, the same witness was asked:

"Q. Did you make any request for the books relating to the wholesale business? A. I made a request for whatever books she had in regard to the retail sales, purchase and sales slips, everything was described; the necessary books were described in the subpoena served on Mrs. Cohen."

It must be found as a fact in the case that the orders which the four agents of the Department of Justice had received, as testified to by Mr. Morgan, were that if neither Mrs. Cohen, Simon Brasley, or Leon Krieger had been in the store, then Mr. Morgan would not have gone in, and Mr. Rice would have come out, and all would have proceeded back to the office. From that a fair inference must be drawn that, if the evidence desired could not be secured on that occasion, they would carry out the same plan at a later date. The witness Morgan testified:

"Q. Did you go up into the balcony? A. Not until after Mrs. Cohen went up. Q. How long after that did she and Mr. Rice go on the balcony? A. They stayed downstairs quite a while; she got some books or records in this little alcove; after they went up, I remarked to Mr. Rice that one of us should go up, and we both went up; whether he preceded me or not I don't know."

He was further asked:

"Q. Did you take possession of any of these books or papers yourself? A. Not at that time. Q. What time did you take possession of them? A. Coming out of the store. * * * Q. Who carried these two packages downstairs? A. Mr. Rice went downstairs before either Mrs. Cohen or myself, and I don't know which one of us carried it down. Miss Harper was there, and the cashier was there, and Mrs. Cohen was there. Q. You didn't carry any of them? A. They were carried down to the main floor, and one package was set on the radiator, or something, a shelf, in that little alcove. We waited there 15 or 20 minutes, waiting for some men, of the men that Mr. Rice had sanctioned going out to lunch."

The witness states that he took the package from one of the women clerks "through courtesy." He testified:

"Q. What did you say to her? A. I said: 'I will take that package off you.' Q. Did you see Mr. Rice take a package from the other young lady? A. I didn't see him take it, but I saw him with the package on the way up."

After the officers reached the Federal Building, they turned the packages over to two of the men clerks who had been summoned as witnesses. On cross-examination the witness further said:

"Q. Before that time you thought it important enough, and you were suspicious enough, to go up to the balcony and see that you got the records. Do you mean to say— A. Not suspicious. Q. Didn't you state to Mr. Rice that 'we had better go up and see—' A. Just to see that we got the records. Q. You were afraid you wouldn't get them? A. Possibly. Q. And with that state of mind, didn't you watch who carried those records, down from that balcony? A. Not particularly who carried them down. Just so they were carried."

Further on he testified:

"Q. Those records were setting on the ledge; weren't you watching them all the time? A. Yes, sir."

He further testified:

"Q. Why didn't you turn that package of books over to Caplan right away? A. Just for that fact; we would have to wait for him to get to the Federal Building."

It appears from the testimony of the witness, who was then United States attorney, that after the books and witnesses had been brought to to the Federal Building he was not ready to proceed with the matter before the grand jury further than to introduce the books, papers, etc., and have them identified, after which they were placed in his vault. They were used later before the grand jury, who returned a true bill against petitioners on May 22, 1920.

The subpoenas duces tecum were in the usual form, and contained the command:

That the witnesses, "laying aside all manner of business and excuses whatsoever," should appear before the court "forthwith to give evidence on

the part of the United States generally, and not to depart the said court without leave thereof or the United States district attorney. Herein fail not under penalty of $400."

Said subpœnas further contained the direction on the outside that—

"All witnesses subpœnaed on behalf of the government are required to report in person at the office of the United States attorney promptly on their arrival in the city; otherwise, they will be presumed not to have obeyed the subpœna, and will be subject to attachment."

As will be seen by reference to the petition for the subpœnas duces tecum, an inference may be drawn that the proposed investigation was directed to the conduct of a corporation and its owners and officers. As a matter of fact, the investigation was intended to be directed against *a partnership* composed of Simon Brasley, Leon Krieger, and Bessie B. Cohen, who are the petitioners who now ask for the return of their books and papers.

The court must find that the production of the books and papers of the petitioners was compulsory. Indeed, the evidence justifies a finding that there was a seizure of the books and papers by officers of the Department of Justice. They were the private documents of the three petitioners. No one of them had any greater right therein than each of the others. From the petition of the United States attorney, the documents were necessary in the investigation undertaken by him. We must assume that, without the documents, the indictment would not have been found.

It is no answer on the part of the government that no objection was made by Mrs. Cohen at the time to the proceedings. There were in the store two representatives of the Department of Justice, one of whom presented to her the command of this court that she forthwith appear before the grand jury, while the other was serving clerks with subpœnas requiring them also forthwith to appear. There were the watchful eyes of the two men, known to her to be agents of the Department of Justice, seeing that the documents were immediately put in bundles, and that no material documents should be omitted. The eyes were watchful, according to the testimony of the witnesses, to see that none of the records got away while in the store. The hands of the officers kept a grasp upon the records while they were being taken from the store to the Federal Building. The officers "sanctioned" that some of the men could go to lunch while they waited for their return. It is clear to my mind that there was restraint put upon all the witnesses in the store, and restraint upon Mrs. Cohen intended to result in the production of the documents that were deemed necessary by the United States attorney.

It is unfortunate for the administration of justice that the fundamental rights of citizens and residents of the United States are, from time to time, ignored by those having to do with the administration of justice. Time and again it has been necessary for the courts to emphasize the fact that it is much better that many offenders of the law escape justice than that the fundamental rights guaranteed by the Constitution should be in any way violated. We have to do, in this case, with the Fourth and Fifth Amendments, which it is well should be

often reprinted, that they may be often seen and constantly kept in mind:

"Article IV. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

"Article V. No person * * * shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation."

The cases in which the courts have held that the constitutional provisions found in the foregoing sections have been violated are so numerous that a review of them would avail nothing. This is a case of individuals whose books were taken from them by the process of this court, to be used as evidence against them, in order to indict them for criminal acts.

In the case of Hale v. Henkel, 201 U. S. 43, 76, 26 Sup. Ct. 370, 379 (50 L. Ed. 652), a case arising wholly out of a writ of habeas corpus, the Supreme Court says:

"We are also of opinion that an order for the production of books and papers may constitute an unreasonable search and seizure within the Fourth Amendment. While a search ordinarily implies a quest by an officer of the law, and a seizure contemplates a forcible dispossession of the owner, still, as was held in the Boyd Case, the substance of the offense is the compulsory production of private papers, whether under a search warrant or a subpœna duces tecum, against which the person, be he individual or corporation, is entitled to protection."

A reference to the Boyd Case (see Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746) is all that is necessary, because, so far as it has been brought to my knowledge, it is referred to in every case in which the question of unlawful searches and seizures and involuntary self-incrimination is considered. That was a proceeding under the Revenue Act, in which a certain partnership, E. A. Boyd & Sons, were claimants. In accordance with certain provisions of law, the claimants were notified to produce a certain invoice or paper tending to support the cause of the government in the forfeiture proceedings, with a clause in said notice that, if they failed to produce such invoice or paper in obedience to such notice, the allegations on the part of the United States should be taken as confessed, with the further provision that, if produced, the paper might be examined in the presence of the claimants and offered in evidence on behalf of the United States. Mr. Justice Bradley, speaking for the court, says:

"It is our opinion, therefore, that a compulsory production of a man's private papers to establish a criminal charge against him, or to forfeit his property, is within the scope of the Fourth Amendment to the Constitution, in all cases in which a search and seizure would be, because it is a material ingredient, and effects the sole object and purpose of search and seizure."

The court, then, having determined that the steps taken in the court below constituted a search and seizure, proceeded to consider whether it was an *unreasonable* search and seizure," within the meaning of the

Fourth Amendment, or was a legitimate proceeding. The court then holds:

"That a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is compelling him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution, and is the equivalent of a search and seizure—and an unreasonable search and seizure—within the meaning of the Fourth Amendment."

The particular facts as found in the case at bar may be kept in mind as we quote the following from the opinion of Justice Bradley (116 U. S. 635, 6 Sup. Ct. 535, 29 L. Ed. 746):

"Though the proceeding in question is divested of many of the aggravating incidents of actual search and seizure, yet, as before said, it contains their substance and essence, and effects their substantial purpose. It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be obsta principiis."

It is not necessary to say anything more upon the branch of the case now before us than that the entire proceedings whereby the books of the petitioners were seized and produced in evidence before the grand jury were illegal, as being in contravention of their rights fixed by the Fourth and Fifth Amendments. The petitioners, having been illegally deprived of their books and papers, are entitled to have them returned to their possession, and not only that, but to have every memorandum taken therefrom, every photographic or other copy made thereof, returned to them, so that none of the documents shall be available to the United States in the prosecution of the defendants under the indictment, to the extent of furnishing evidence of their guilt. Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; Flagg v. United States, 233 Fed. 481, 147 C. C. A. 367; Silverthorn Lumber Co. v. United States, 251 U. S. 385, 40 Sup. Ct. 182, 64 L. Ed. 319, decided January 26, 1920.

At the time of the hearing the United States attorney presented a petition that all the documents hereinabove referred to should be impounded in the custody of the court, and that the clerk be directed to take and hold them, so that they may be available for use as evidence in the trial of this case. This petition must necessarily be refused, in view of our finding that the compulsory production and use of the documents was in violation of the rights of the several partners who asked for the return of the same.

The rule granted upon the United States attorney must be made absolute, and the petition of the United States attorney for the impounding of the books must be refused. Let a proper order be drawn.