In the Matter of UNITED STATES of America, Petitioner,

v.

Harry G. SILVERSTEIN, Respondent.

United States District Court
S. D. New York.
Oct. 30, 1962.

**402**

Vincent L. Broderick, U. S. Atty. for Southern Dist. of New York, for petitioner; Anthony H. Atlas, Asst. U. S. Atty., of counsel.

Corcoran, Kostelanetz, Gladstone & Lowell, New York City, for respondent; Raymond Rubin and Jules Ritholz, New York City, of counsel.

TYLER, District Judge.

The government moves for an order, pursuant to 26 U.S.C. §§ 7402(b) and 7604, directing respondent, Harry G. Silverstein, to produce the books and records set forth in an Internal Revenue summons dated May 16, 1961, served upon respondent on that day pursuant to 26 U.S.C. § 7602.

The summons, in the nature of a subpoena duces tecum and addressed to the respondent, directed him to appear on May 26, 1961, before a Special Agent of the Internal Revenue Service, and there to produce for examination specified books and records of five [1] named partnerships, of which respondent is, in all cases, a general partner.

Respondent appeared before the Special Agent as directed but there refused, and has continued to refuse, to produce the partnerships' books and records specified in the summons.

The sole ground for respondent's refusal to produce these documents is his assertion, under the Fifth Amendment to the Constitution of the United States, of the privilege against self-incrimination.[2] More particularly, he asserts that the Fifth Amendment forbids the use of compulsory legal process to secure these documents for examination in view of his recorded refusal to produce them with the concomitant statement by him that they may tend to incriminate him.

The government urges that the privilege does not protect respondent as to the documents here sought since they are the property, respectively, of the five named partnerships and that, under controlling case law, these partnerships are of such a nature that a general partner thereof may not assert the privilege against self-incrimination with respect to their books and records.

It is beyond substantial dispute that the privilege may, under circumstances otherwise appropriate, be asserted by one who appears before a Special Agent of the Internal Revenue Service in response to a summons issued under the authority of 26 U.S.C. § 7602. In re

---

1. Respondent states by affidavit that one of these five partnerships is now defunct. He does not argue that this fact is material to our decision here.

2. From the summons' caption, it appears that the investigation in which it issued is directed towards the income tax liabilities of the two other general partners of these five partnerships as well as towards the correctness of respondent's tax returns. If does not appear, however, that respondent seeks to invoke the privilege on behalf of anyone but himself.

Turner, 309 F.2d 69 (2d Cir., 1962). The government, as heretofore indicated, while conceding that an appearance before an Internal Revenue Special Agent is not a "criminal proceeding", does not urge this point as precluding respondent from claiming his privilege.

Thus, this proceeding poses the question whether the government, under the circumstances of this case, may subpoena partnership records through a general partner, which records that partner asserts will incriminate him.

The Fifth Amendment declares, in part, " * * * nor shall [any individual] be compelled in any criminal case to be a witness against himself * * *." Constitution, Amend. V.

Justice Frankfurter, writing for the Supreme Court, has given concise expression to the significance of this provision of the Bill of Rights:

"Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrowed by the Star Chamber from the Continent whereby an accused was interrogated in secret for hours on end." Watts v. Indiana, 338 U.S. 49, 54, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801 (1949).[3]

This important principle has proved difficult to administer.[4] The difficulty is attributable, in part, to the pragmatically required expansion of the scope of the principle beyond its literal meaning.

For example, it was early understood that in order to give effect to the Fifth Amendment, it was necessary to extend its reach to government proceedings which, not in themselves a "criminal trial", could yield the evidence to be used in such a trial. Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

Also, the privilege was extended beyond the oral testimony of an individual to include the production by him of his personal property, which could itself "speak for" and incriminate its owner. Boyd v. United States, 116 U.S. 616, 634–635, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

The latter application of the privilege has caused difficulty in judicial administration and interpretation in more than one respect. The particular difficulty inherent in the present case arises from the fact that the ownership or dominion of a given individual over given property may be shared with others or derivative in nature, and to that extent diluted.

The cases at an early stage appeared to apply a clear rule to situations where the property with respect to which the privilege was sought to be asserted belonged, in the first instance, either to a corporation or to a partnership. The rule, simply stated, was that the privilege was available to no one individual where a corporation owned the property, Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911), but was available to a partner with respect to the property of the partnership. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); United States v. Brasley, 268 F. 59 (W.D.Penn.1920).

This distinction in the older cases was based on several grounds: It was reasoned that the property of a corporation is owned by the corporation, and any control over it by individuals is exercised in

3. See, also, 2 Pollack and Maitland, The History of English Law, pp. 656–661 (2d Ed. 1898); John H. Wigmore, "The Privilege Against Self-Incrimination; Its History", 15 Harv.L.Rev. 610 (1902); 1 Cooley, Constitutional Limitations, pp. 647–648 (8th Ed. 1927). ("But a far more important requirement is that the proceeding to establish guilt shall not be inquisitorial. A peculiar excellence of the common-law system of trial over that which has prevailed in other civilized countries, consists in the fact that the accused is never compelled to give evidence against himself.")

4. "Nowhere, perhaps, does the difficulty of maintaining a just balance between the general security and the individual life make so much trouble for the administration of criminal justice as at this point." Roscoe Pound, The Development of Constitutional Guarantees of Liberty, p. 87 (1957).

a purely representative capacity; the nexus of ownership is completely lacking. Also, the state, which in fact sets down the conditions of the origin and existence of each corporation, has a great interest in regulating and controlling these frequently large and powerful entities. The public interest forbids the interposition of a purely private right between the state and its creature, the corporation. It was thought that partnerships, normatively smaller in scope, do not generally give rise to the same need for public regulation. And, more important, the property of a partnership is owned in common, personally, by each of its (general) partners. Partnership documents, therefor, were conceived to "belong to" the individual partners.

However, the Supreme Court in comparatively recent times has made clear that the proper rule is not in all cases a simple or mechanical one. United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944).

■ In the White case, the Fifth Amendment privilege was sought to be asserted by an official of a labor union with respect to records of the union. The rule stated by the Supreme Court, in reaching the decision that no privilege could be asserted by the respondent therein, expressly eschewed a mechanical approach, and set down instead a flexible test grounded on the basic principles which underlie the privilege:

"The test, rather, is whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only." White, supra, at p. 701, 64 S.Ct. at p. 1252.[5]

Since White, the lower courts have applied this "flexible test" in determining whether the personal privilege embraces documents belonging to a partnership.[6]

Two cases heavily relied upon here by the government are United States v. Onassis, 125 F.Supp. 190 (D.C.D.C.1954), and United States v. Onassis, 133 F. Supp. 327 (S.D.N.Y.1955). In both of these cases the court rejected motions to quash subpoenas duces tecum issued to a general partner of a certain partnership and requiring production of partnership records.

The partnership involved in both Onassis cases, named Simpson, Spence and Young, was composed of eight general partners and was described by Judge Youngdahl as follows:

"As stated at the outset, the firm acts as brokers for the sale, purchase and chartering of ships. It has offices in London and Glasgow as well as in New York. It acts as manager for the Texas Transport & Terminal Company, Inc., which has offices in New York, Philadelphia, Baltimore, Charleston, Savannah, New Orleans, Galveston, Corpus Christi, Houston, Dallas and Memphis. It is sufficiently organized to have Mr. Daly as comptroller and Mr. Tuffy as an accountant and a substantial number of employees working in the accounting and opera-

5. "Basically, the power to compel the production of the records of any organization, whether it be incorporated or not, arises out of the inherent and necessary power of the federal and state governments to enforce their laws, with the privilege against self-incrimination being limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records." White, supra, pp. 700–701, 64 S.Ct. p. 1252.

6. As regards the documents of a corporation, they are virtually always held in a purely representative capacity, and in that case no privilege is assertable as to them. White, supra, at p. 699, 64 S. Ct. at p. 1251. But occasionally they may be found to have been held in a personal capacity. Application of Daniels, 140 F.Supp. 322 (S.D.N.Y.1956).

tions departments." (Onassis (D.C. D.C.), supra, 125 F.Supp. at p. 210.)

The district courts in each case concluded that under the test set forth in White, the privilege against self-incrimination could not be raised with respect to the books and papers of the partnership Simpson, Spence and Young.

Another case applying the test set down in White to a partnership, in which the assertion of privilege was upheld, involved a firm, "O. Casperson and Sons", composed of six general partners who had a close family relationship. Neither the nature of the business nor its scope are described in any detail in the opinion of the court. In re Subpoena Duces Tecum, 81 F.Supp. 418 (N.D.Cal.1948). The court stated that, under White, "It may be that some partnerships, which have a large number of partners, perhaps special or limited as well as general, might, as well, take on the habiliments of an association or corporation." It went on to find that "this small family partnership" did not fall within that class.[7]

Here the documents sought are books and records of five partnerships organized under the laws of New York State, in each of which respondent Harry G. Silverstein, his son, Larry A. Silverstein, and son-in-law, Bernard H. Mednik, are the only general partners. Four of the partnerships own, respectively, a unit of real estate in New York City, from which the partnership derives its name; the fifth, Medical Arts Building Co., now defunct, owned real property located in Norfolk, Virginia. The capitalization and membership of these five partner-ships are stated by the government, without contradiction, to be as follows:[8]

| Name | Limited Partners | Capitalization |
| --- | --- | --- |
| 212 East 23rd Street Co. | 26 | $ 340,000 |
| 305 East 37 Co. | 55 | 1,070,000 |
| Medical Arts Building Co. | 25 | 225,000 |
| Decorative Arts Center Co. | 119 | 2,740,000 |

The real estate is managed by a sixth partnership, "Silverstein Management Co." (which is not mentioned, nor are its records called for, in the summons), pursuant to a contract with each of the five partnerships. It appears that the five partnerships do not have separate office addresses or telephone listings, but have their place of business at the office of Silverstein Management Co., 366 Broadway, New York City. There is a small staff at this office. Respondent states that at the time the summons was originally issued there was in the office only one secretary in addition to the three general partners.

In reaching the decision, which we do in the instant case, that the respondent is not entitled to the privilege he seeks to assert here, it might be enough to say simply that each of the five partnerships, by virtue of its membership and the scale of its activities, is not a "small family partnership" but is in the language of the White case, "so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but

---

7. In re Subpoena Duces Tecum has been cited in support of the proposition that, simply, " * * * the privilege against self-incrimination is available as to partnership records, for they are personal records." United States v. Lawn, 115 F. Supp. 674, 677 (S.D.N.Y.1953). But, in view of the language quoted in the text above, I do not understand In re Subpoena Duces Tecum to hold that, since White, such a simple test suffices. See, apparently favoring the continued use of such a test after White, United States v. Linen Service Council of New Jersey, 141 F.Supp. 511, 512–513 (D.N.J.1956).

8. Corresponding information with respect to the fifth partnership, "Varrick-44th St. Co.", has not been made available to the court. However, based on information made available to the court by petitioner and uncontradicted by respondent, it appears that "Varrick-44th St. Co." is comparable in membership and capitalization to "305 East 47 Co.".

rather to embody their common or group interests only." [9] White, supra, 322 U.S. at p. 701, 64 S.Ct. at p. 1252. But there are additional premises for our decision.

Many of the cases, including White, state that no privilege is assertable as to documents held in a "representative capacity". E. g., McPhaul v. United States, 364 U.S. 372, 380, 81 S. Ct. 138, 5 L.Ed.2d 136 (1960); United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944). This "representative capacity" is clearly present where the individual concerned is an elective or appointive officer acting for a group, such as a corporation or a labor union, which has bestowed upon him the rights and duties of his office.

In the context of a business enterprise, the quality of representative capacity can be realistically defined as the exercise of control where control is divorced from ownership. It is true that the respondent has to some degree the indices of "ownership" with respect to these five partnerships. As a general partner, he is personally liable for their debts; as a limited partner, he contributed some five to ten per cent of the original stated capital contributions of each of the five partnerships.

But respondent's role in these partnerships, and in the Silverstein Management Co. which, though not formally involved here, manages the properties they hold and thus cannot realistically be shut out from our consideration, is to a much greater extent the role of an executive or agent acting for, and representing the interests of, a substantial body of limited partners.

With respect both to income and to the proceeds of liquidation, the limited partners have priority over respondent in his capacities both as limited partner and as general partner.[10]

Also, again emphasizing the representative nature of respondent's activities, in the partnership agreements of at least three of these partnerships,[11] the general partners undertake [12] not to "sell, assign or convey the partnership property" without first securing the written consent of sixty per cent of the limited partners.[13] In at least one of the partnerships the same undertaking is made with respect to dissolution of the partnership.[14] Silverstein Management Co., of which respondent is one of the three general partners, receives fixed compensation and commissions for the work of managing the properties.[15]

9. It should be noted that the language used in this phrase appears to assume that "personal interests" and "group interests" are mutually exclusive categories. It must be clear, however, that to the extent *personal* interests are shared with others they become—by virtue of the sharing—*group* interests as well. The test expressed in this phrase from White is perhaps best conceived, therefore, as being directed to the *extent to which* an individual's interests are shared with and assimilated into the shared or corporate interests of a group.

10. Partnership Agreements: 212–24 East 23rd Co., §§ 8(b), 20; 305 East 47 Co., §§ 8(b), 19; Decorative Arts Center Co., §§ 10(b), 16; Medical Arts Building Co., §§ 10(b), 21.

11. The text of the partnership agreement of Varrick-44th St. Co. has not been made available to the court.

12. Expressed in the partnership agreements as a declaration of "intent" on the part of the general partners.

13. Decorative Arts Center Co., § 12(b); 305 East 47 Co., § 10(b); Medical Arts Building Co., § 12(b).

14. 212–24 East 23rd Co., § 19. The general partners have also undertaken to give the limited partners written notice of any capital improvement valued in excess of $10,000. See 212–24 East 23rd Co., § 10(a); 305 East 47 Co., § 10(b); Decorative Arts Center Co., § 12(b); Medical Arts Building Co., § 12(b).

15. 212–24 East 23rd Co., § 13(e); 305 East 47 Co., § 13(e); Decorative Arts Center Co., § 15(e); Medical Arts Building Co., § 15(e). The annual compensation fixed in the above-named sections for the management services of Silverstein Management Co. is, for each of the four, respectively: $4,200; no set figure; $16,000; $2,000 (supervisory capacity only). These figures are exclusive of leasing commissions, which are also provided.

Other courts, in denying the privilege sought to be raised as to records of a corporation have observed that corporations are creatures of the state's making, endowed with special rights, and that a concomitant of such rights is responsibility to supervision by the state. Wilson v. United States, 221 U.S. 361, 382–385, 31 S.Ct. 538, 55 L.Ed. 771 (1911). This same reasoning and policy apply with substantial force to another special statutory creature, the limited partnership.[16] The chief privilege with which these organizations are endowed is, of course, that their limited partners are not bound personally "by the obligations of the partnership".[17] Arguably, this privilege imparts to the partnership a peculiar group or quasi-corporate identity, thereby providing another element divorcing the books and records thereof from individual, personal ownership or interest.

More certainly, as Judge Walsh pointed out in his Onassis decision (133 F.Supp. at pp. 331–332), the New York statute substantially circumscribes a general partner's dominion over partnership records. He does have a property interest in the records as tenant in partnership and has the right of access to them; but he has no right to exclusive possession, nor may he assign them without consent of all the partners.[18] And, of much greater significance here in the light of the membership of these five partnerships, the limited partners have the right to have firm records kept at the principal place of business, readily available for their inspection and copying.[19]

Whether or not these factors, together with others cited earlier, yield the result that these records here are, or are not, the "private property" of respondent, is a question more of semantics than of substance. The issue of substance is the nature, and the degree, of respondent's authority over, and interest in, these records. The central aim of this opinion has been to meet that issue squarely.

In the view of this court, the facts establish that the respondent's connection with the books and papers of these five partnerships is sufficiently limited, derivative, and impersonal that the respondent has no right to assert the Fifth Amendment privilege with respect to them. The government's petition is granted. Settle order on notice.

---

16. N.Y.Partnership Law, McKinney's Consol.Laws, c. 39, Article 8.

17. N.Y.Partnership Law, § 90.

18. N.Y.Partnership Law, §§ 41, 51(1), 51(2), 98.

19. N.Y.Partnership Law, § 99.