**UNITED STATES of America,
Petitioner,**

v.

**David COGAN, Respondent.**

**No. M 11 188.**

United States District Court
S. D. New York.

Aug. 2, 1966.

Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, for the United States; Andrew J. Maloney, Asst. U. S. Atty., of counsel.

Joseph E. Brill, New York City, for respondent.

FRANKEL, District Judge.

The respondent, by a grand jury subpoena duces tecum addressed to him as "Custodian of the Records," has been commanded to produce the books and records of six partnerships. He says, and the Government agrees, that he is "the target" of the grand jury's investigations. He has appeared before the grand jury, invoked his privilege against self-incrimination under the Fifth Amendment, and refused to produce the papers. The Government moves for an order compelling compliance; respondent resists the motion and asks that the subpoena be quashed. The contested issue is whether the "personal" privilege respondent claims, Hale v. Henkel, 201 U. S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), is available to him as a member of the partnerships in question, characterized by the Government as "impersonal enterprises."[1] "The inquiry is, therefore, essentially a factual one into the nature of

1. No question is raised as to the potentially incriminating character of the records sought. On the opposing submissions, it is assumed that respondent is justified in claiming the danger exists.

the particular entity." United States v. Silverstein, 314 F.2d 789, 791 (2d Cir. 1963), cert. denied, 374 U.S. 807, 83 S. Ct. 1695, 10 L.Ed.2d 1031 (1963). The materials for the inquiry—in effect stipulated through an affidavit of respondent's counsel which the Government accepts as correct for present purposes— are as follows:

Four of the partnerships, existing successively from November 1956 to July 31, 1965, were accounting firms. The first of these, Cogan and Epstein, was in existence from November 1956 to June 30, 1960, and had the two men for whom it was named as its partners. The successor, Cogan, Epstein & Co., added a third partner and lasted from July 1, 1960, to July 1, 1963. Then came Cogan, Epstein & Bell, comprised of the same three partners, in existence for the year beginning January 1, 1963, and succeeded on January 1, 1964, by Cogan, Epstein, Bell & Maurer, with the four named men as its complement of partners.[2]

A fifth partnership named in the subpoena, D. J. Cogan Agency Co.,[3] was comprised of respondent Cogan and Epstein, his partner in the accounting firms described above. This partnership existed for some ten years, to July 31, 1965, when Epstein withdrew. Its business was the supplying of personal financial management for its clients and the making and management of investments for the partnership account in theatrical productions. Since the withdrawal of Epstein, respondent has continued the enterprise as a sole proprietorship.

Finally, the subpoena calls for the records of D. J. Cogan Co., which was formed in 1958, has twelve general partners, a paid in capital of $100,000, and the ownership of a so-called taxpayer building consisting of five stores and a bowling alley. This partnership's property is managed by a real estate management firm in which the partners have no interest. The partnership has no employees.

The accounting partnerships have been housed in the same suite of New York City offices, partially leased to a subtenant, leaving total net annual rentals to the partnerships that ranged from $1,500 in 1960 to almost $12,000 in 1965. In addition to clerical and bookkeeping help, these partnerships employed part-time accountants from time to time, paying for these services annual totals of from $7,000 to $16,000. Gross income from the accounting partnerships was in the vicinity of $200,000, with net profits as high as $57,000. Gross income of David J. Cogan Agency Co. reached a high of $95,000 in 1965; its highest annual profit figure was $40,000, in 1963; it has served annually from 10 to 61 clients. The 12-man real estate partnership, D. J. Cogan Co., has had an annual profit averaging $3,000.[4]

All of the partnerships have been general; none has had any limited partners. None has provided in any way for perpetuation beyond the life of any partner. Each has been constituted so as to terminate with the death or withdrawal of a partner.

Upon the foregoing facts, the Government urges that the partnership papers respondent has withheld are not his "personal" or "private" effects in the sense

---

2. Respondent's counsel notes in his affidavit a fifth successor accounting firm, commencing July 31, 1965, and still in existence, comprised of three partners and known as Cogan, Bell & Maurer. This last enterprise is not named in the subpoena.

3. The precise name is now said to be David J. Cogan Agency Co.

4. For reasons suggested below, the facts in the paragraph just ended—as to employees, profits, rent, and the like—seem largely or wholly immaterial to the issue presented. They are included here because they are stressed by the Government. The prosecution also says that respondent has interests in an additional "myriad of enterprises"—corporations, joint ventures, limited partnerships, others. This fact, accepting it as such, is more clearly beside the point. The "myriad," not named in the subpoena, suggests that respondent is a man of elaborate, far-flung, possibly involved affairs. It is not perceived how the suggestion bears upon his claimed privilege against self-incrimination.

that entitles him to assert the Fifth Amendment privilege. Rather, it is said, they are the records of impersonal "organizations," held by him as "representative" or "custodian," so that neither he nor the partnerships may validly invoke the privilege.

◼ A contemporary starting-point for the argument, and for the court's decision, is of course the ruling in United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944). Even prior to that, however, it bears recalling, first, that a traditional partnership's papers, if nothing more is shown, have long been assumed to be within the privilege available to any or all of the partners. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); United States v. Brasley, 268 F. 59 (W.D.Pa.1920). Secondly, it is to be borne in mind that the subject is a cherished privilege, which "must not be interpreted in a hostile or niggardly spirit", Ullmann v. United States, 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511 (1956), and the dimensions of which have tended lately to widen rather than contract. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L. Ed.2d 653 (1964); Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). These general premises, though their breadth leaves the concrete case still to be decided, ought to be explicit. They surely bear upon the problem. Specifically, they command that the burden of demonstration is upon the Government when it claims that a man's papers, because he shares their ownership with others, are outside the private domain walled by the Fifth Amendment.

◼ United States v. White, supra, concerned with a subpoena addressed to a labor union, held that neither the union nor an individual officer could invoke the privilege as ground for refusing production of the union's records. The privilege, the Court observed, is "essentially a personal one, applying only to natural individuals." 322 U.S. at 698, 64 S.Ct. at 1251. While it covers documents as well as oral disclosures, the papers entitled to the protection "must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity." Id. at 699, 64 S.Ct. at 1251. Accordingly, "individuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely personal privileges." Ibid. Records held in such a "representative * * * capacity * * * are not the private records of the individual members or officers of the organization." Ibid. They are "impersonal records and documents * * *." Id. at 700, 64 S.Ct. at 1252. They belong to "an institution which involves more than the private or personal interests of its members." Id. at 701, 64 S.Ct. at 1252; see also 703, 64 S.Ct. 1253. "The test," the Court said, for separating the "private" group from the impersonal institution is not the mechanical application of legal characterizations like "corporation" or "unincorporated association." Id. at 701, 64 S.Ct. at 1252. It is, "rather, * * * whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only." Ibid.

In the years since 1944 the Supreme Court has paid occasional revisits to the doctrine of United States v. White, and the lower courts have conjured with a "test" that has not always been easy to apply. See, e. g., United States v. Silverstein, 314 F.2d 789, 790 (2d Cir. 1963), cert. denied, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1031 (1963); Meltzer, Required Records, the McCarran Act, and the Privilege against Self-Incrimination, 18 U.Chi.L.Rev. 687, 704–706 (1951). In its subsequent references to the question, the Supreme Court has not talked about the difficult and somewhat amorphous notion of "impersonality." It has stressed instead the question whether

papers are held in a "representative capacity," on behalf of "a collective group," by a "custodian" performing the "duties of his office," of whom it may be fairly said that "he does not own the records and has no legally cognizable interest in them." See McPhaul v. United States, 364 U.S. 372, 380, 81 S.Ct. 138, 5 L.Ed.2d 136 (1960) (concerned with the Civil Rights Congress); Curcio v. United States, 354 U.S. 118, 122–123, 128, 77 S.Ct. 1145, 1151, 1 L.Ed.2d 1225 (1957) (a labor union); Rogers v. United States, 340 U.S. 367, 372, 71 S.Ct. 438, 95 L.Ed. 344 (1951) (Communist Party). See also United States v. Silverstein, 210 F. Supp. 401, 406 (S.D.N.Y.1962), affirmed, 314 F.2d 789 (2d Cir. 1963), cert. denied, 374 U.S. 807, 83 S.Ct. 1696, 10 L. Ed.2d 1031 (1963).

In this District and Circuit, the rule of United States v. White has been held applicable to limited partnerships, popularly known as "syndicates," that included limited partners (essentially investors divorced from management) numbering from 25 to 147. United States v. Silverstein, supra. Such entities, it has been thought, take on a "peculiar group or quasi-corporate identity * * *." 210 F.Supp. at 407. The managerial general partner, working with other people's money under defined delegations of authority and responsibility, could be said to lack "individual, personal ownership or interest" in the records demanded. Ibid. It aptly depicted his legal and factual status to say his was a "representative capacity," serving as "executive or agent acting for, and representing the interests of, a substantial body of limited partners." Id. at 406. And even in those circumstances, the question was thought to be "not free from difficulty." 314 F.2d at 790.[5]

United States v. Onassis, 125 F.Supp. 190 (D.D.C.1954), another case upon which the Government relies, also involved a limited partnership, with offices in London, Glasgow, and New York, "sufficiently organized to have [a] * * * comptroller and * * * an accountant and a substantial number of employees working in the accounting and operations departments"—an organization the Court thought could "hardly be considered small or personal." Id. at 210. In addition, it appears that the organization had reached for the most non-personal and non-private of attributes, a measure of immortality, by providing for non-dissolution upon death or retirement of a partner. See United States v. Onassis, 133 F.Supp. 327, 333 n. 13 (S.D.N.Y. 1955), involving the same firm and essentially the same question.

Neither counsel's researches nor ours have disclosed a case where a general partnership—with its life measured by the survival and adherence of the partners, with property, management, responsibility, and fiduciary duty all organized in the traditional way—has been held to be within the principles of United States v. White.[6] On the contrary, it has been assumed without much discussion that the 80-year-old result of Boyd v. United States, supra—reached there, it should be said, without *any* discussion of this particular point—remains good constitutional law. United States v. Lawn, 115 F.Supp. 674, 677 (S.D.N.Y. 1953), appeal dismissed, United States v. Roth, 208 F.2d 467 (2d Cir. 1953); In re Subpoena Duces Tecum, 81 F.Supp. 418 (N.D.Calif.1948).

■ Heeding *White's* admonition that mechanical reference to legal categories is not the way to handle the problem, we cannot conclude that the records of all

---

**5.** A second *Silverstein* case, United States v. Silverstein, 237 F.Supp. 446 (S.D.N.Y.) affirmed, 344 F.2d 1016 (2d Cir.), cert. denied, 382 U.S. 828, 86 S.Ct. 65 (1965), presented essentially similar facts.

**6.** The *Onassis* case in this District, 133 F.Supp. 327, which appears thus far to stand alone in its reasoning, would evidently allow compulsory production of records by any one general partner where the only danger of incrimination was to another partner. There is no need just now to treat with that situation; as noted above, the respondent claims the privilege for his own protection.

things known to the law as general partnerships are necessarily clothed with the privilege. It may be that the principles of *White* will reach partnerships with scores or hundreds of members, where the relationship is not and cannot be face-to-face, where there is an inevitable measure of bureaucratization, of defined "office" apart from particular incumbents, of permanence, "institutionalization," and action by designated agents in "representative capacities." Cf. Smigel, The Wall Street Lawyer—Professional Organization Man? (1964). Possibilities of that sort can be left for another day. They are not approached in the case at bar.

The partnerships here in question are "small" and personal by any standards. Cf. Caplow, Principles of Organization 26–27 (1964). Apart from the real estate firm, which has twelve, the largest has (or had) four partners. There is nothing in the stipulated facts to suggest that any of the partners acted in a defined "representative capacity" for the others, no indication that any of the partners was "limited" in any sense or comparable to a corporate investor—no evidence, in short, of deviation from the standard partnership pattern of joint and several powers and responsibilities.

The Government stresses the size and diversity of respondent's partnership interests, swelling the picture by listing his investments and activities in other ventures, which are neither involved here nor described with any clear indication of the amount or nature of respondent's participation. Presumably for more vivid coloration, the Government also states that the D. J. Cogan Agency "has as clients such notables as" four named individuals the court can recognize, though it perhaps ought not to notice judicially, as entertainment celebrities. None of this adds to the case against the claim of privilege. For one thing, while the partnerships, singly as well as in combination, appear to be substantial ventures, they are scarcely gargantuan. More importantly, while the cases denying the privilege have dealt with "common enterprises of considerable size" (United States v. Silverstein, supra, 314 F.2d at 791), the focus has been on the extent and character of the ownership group, not on the size of the business in balance-sheet terms. In this pertinent sense, respondent's partnerships remain well within the protected class. To hold otherwise would be to veer toward a proposition no one has yet suggested—that even a sole tycoon, by virtue of his large business holdings, could be stripped of the privilege with respect to his business records. To be sure, there may be a considerable public interest in having access to such papers, and there may be situations in which their prescribed character makes them unprivileged "public documents." Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). But that is not claimed to be the case here. And so neither the size nor the luminous clientele of the partnerships, nor both together, can sustain the Government's position.

Finally, a word about the Government's view that partners lose the privilege when their ventures become larger or colder than intimate groups in the nature of "family partnerships." There are judicial phrases saying something like this, but only in cases where other grounds account for the decisions. See United States v. Onassis, 125 F.Supp. 190, 210 (D.D.C.1954); cf. United States v. Onassis, 133 F.Supp. 327, 334–335 (S.D.N.Y.1955); In re Subpoena Duces Tecum, 81 F.Supp. 418, 421 (N.D.Calif. 1948.) There is really no solid authority for the Government's contention, and we reject it. The Fifth Amendment privilege would become a chancy thing if its availability came to turn on inquiries into the states of comparative intimacy and trust among kinfolk, mere friends, or small groups of "strictly business" associates.

The Government's application is denied. Respondent's counter-application, that the subpoena be quashed, is granted.

It is so ordered.